Max HUGEL, Plaintiff, Appellee,

v.

Thomas R. McNELL, et al.,
Defendants, Appellants.

No. 88–1528.

United States Court of Appeals,
First Circuit.

Heard Oct. 4, 1988.

Decided Sept. 21, 1989.

John S. Whitman with whom Richardson & Troubh, Portland, Me., was on brief, for appellants.

Mark W. Dean with whom Matthias J. Reynolds and Devine, Millimet, Stahl & Branch Professional Ass'n, Manchester, N.H., were on brief, for appellee.

Before BOWNES and BREYER, Circuit Judges, BROWN,* Senior Circuit Judge.

JOHN R. BROWN, Circuit Judge.

I

Though the saga of the Hugel/McNell feud takes many twists and turns as does a good novel, we are faced with a very real problem which cuts to the heart of a federal court's ability to practice its trade, namely personal jurisdiction. The McNells challenge a default judgment against them in the District of New Hampshire District Court on the grounds that the court did not have personal jurisdiction over them. As sources of information leading to the publication of an article in the *Washington Post* which forced Hugel to resign his post as Deputy Director of Operations of the Central Intelligence Agency, the McNells argue that the default judgment against them is void for lack of personal jurisdiction. They assert that they do not have sufficient minimum contacts within the state of New Hampshire to support personal jurisdiction under N.H.Rev.Stat. ¶ 510:4.[1]

Additionally, the McNells urge that service of process was insufficient and the district judge abused his discretion in denying F.R.Civ.P. 60(b) relief.

*All the News That's Fit to Print*

The relationship between Hugel and the McNells could easily be the basis of a television mini-series. We will confine our rendition of the facts to the bare minimum required for our review of the instant litigation leaving interested readers in suspense until the release of the mini-series.

Hugel and Sam McNell entered into a limited partnership for the purpose of buying and selling securities. In the course of their business relationship, Hugel loaned Sam $377,000 which was secured by some Maine real estate. By September 1974 Hugel and Sam had terminated the limited partnership, and Hugel's relationship with both Sam and Tom McNell had gone sour. Sam's debt to Hugel remained unpaid, and Sam failed to pay Hugel proceeds of the insurance policy Sam collected when the house on the property securing the loan burned down.

In 1981, the bad blood between the McNells and Hugel still boiling, Tom McNell met with 2 Washington Post reporters and discussed allegations that Hugel was involved in illegal securities transactions. Hugel by that time had left his executive position with a New Hampshire corporation after his being appointed Deputy Director of Administration for the CIA. Tom gave the *Washington Post* reporters tapes of phone conversations with Hugel. Sam McNell also met with the reporters and substantiated allegations about Hugel.

The *Washington Post* on July 14, 1981 printed a front page article under the headline "CIA Spymaster Accused of Improper Stock Practices." The article was based on the tapes and information the McNells had provided. The Hugel story was quickly disseminated throughout the country via national news services and TV and radio networks. After this media blitz, Hugel resigned his CIA position. On the same day the McNells disappeared.

On November 3, 1982 Hugel filed the instant diversity suit against the McNells in the District of New Hampshire alleging two counts of defamation slander (Count I) and libel (Count II). Recognizing that neither of the McNells were residents of the Granite State (New Hampshire), Hugel filed a motion for service without the state and requested service by publication. Thereafter process was served by filing on the Secretary of State, sending a copy of service to the McNells at their last known abodes, publication for three consecutive

---

* Of the Fifth Circuit, sitting by designation.

1. N.H.Rev.Stat. ¶ 510:4 provides:
   Any person who is not an inhabitant of this state and who, in person or through an agent, transacts any business within this state, commits a tortious act within the state, or has the ownership, use, or possession of any real or personal property situated in this state submits himself, or his personal representative to the jurisdiction of the courts of this state as to any cause of action arising from or growing out of the acts enumerated above.

weeks in *The New York Times* and *Asbury Park Press,* and nationwide distribution of 2 press releases by United Press International.

The McNells, still in hiding, did not respond to Hugel's complaint. On February 24, 1983 a default judgment was entered against the McNells, and after a hearing on damages the district court on September 25, 1984 issued a judgment awarding Hugel $931,000.

In May 1987 the McNells surfaced—with the help of California law enforcement officers—and faced criminal charged of conspiracy to defraud the U.S. Government and interstate transportation of stolen goods. The McNells pleaded guilty and were sentenced to prison terms for these crimes.

On November 7, 1987 the McNells moved for relief from Hugel's default judgment under F.R.Civ.P. 60(b)(6). After a hearing, the district judge denied the motion and the McNells appeal that denial. Meanwhile, Hugel seeks Rule 11 sanctions against the McNells' legal counsel.

On appeal the McNells argue that (i) the district court lacked personal jurisdiction over them; (ii) insufficient service of process violated their rights to due process; and (iii) the district judge abused his discretion in denying their Rule 60(b)(6) motion for relief from judgment.

## II

### Personal Jurisdiction In the Granite State

■ In determining whether personal jurisdiction was properly asserted over the McNells, the district judge first looked at the New Hampshire long arm statute. That statute confers jurisdiction over nonresident defendants who themselves or through an agent commit a tortious act in New Hampshire. N.H.Rev.Stat. ¶ 510:4(I). It is settled New Hampshire law that a party commits, for jurisdictional purposes, a tortious act within the state when injury occurs in New Hampshire even if the injury is the result of acts outside the state. *Tavoularis v. Womer,* 123 N.H. 423, 426, 462 A.2d 110, 112 (1983) (citing *Hall v. Koch,* 119 N.H. 639, 406 A.2d 962 (1979)). Therefore, even though the McNells' alleged acts of slander and libel actually took place physically outside the New Hampshire state lines, the district court properly found that the long arm statute applies because the complaint alleged that the McNells' defamation of Hugel resulted in injury to his business reputation within New Hampshire. Having passed that hurdle, we must proceed to the federal constitution to consider whether the New Hampshire federal court's assertion of personal jurisdiction over the McNells violates the due process clause under "traditional notions of fair play and substantial justice." [2]

## III

### Federal Constitutional Query [3]

■ Personal jurisdiction, and specifically the constitutionality of State application of long arm statutes, is a topic which over the years has puzzled first year law students and learned jurists alike. The instant case adds yet another dimension to the puzzle.

---

**2.** *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945); *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278, 283 (1940).

**3.** Contrary to the argument of Hugel, the McNells did not waive their objection to lack of personal jurisdiction. The McNells made no appearance prior to final judgment and thus never waived the defense of lack of personal jurisdiction by failure to raise it in a responsive pleading under F.R.Civ.P. 12(g) & (h)(1). In their first appearance before the district judge (the motion to vacate the judgment), the McNells challenged the district court's exercise of personal jurisdiction. As such they never acquiesced to the district court's jurisdiction or waived their right to contest the assertion of personal jurisdiction. *See* 6 *Moore's Federal Practice* para. 55.09 ("where the court rendering the default judgment is shown to lack personal jurisdiction over the defendant, ... the judgment may be vacated and set aside by the rendering court on motion, or by another court on collateral attack."); Friedenthal, Kane & Miller, *Civil Procedure* ¶ 3.27 at 184 (1985); Ellington, *Unraveling Waiver by Default,* 12 Ga.L.Rev. 181, 185 (1978).

In *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283, 1298 (1958), the Supreme Court instructed that a defendant corporation who "purposefully avails itself of the privilege of conducting activities within the forum State" has sufficient "minimum contacts" so that it can be haled into court within the forum State without violating the guarantees of due process. We then learned that foreseeability alone is not enough for a forum State to assert personal jurisdiction, *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 295-96, 100 S.Ct. 559, 566, 62 L.Ed.2d 490, 501-01 (1980) *unless* it "asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *Id.* at 297-98, 100 S.Ct. 559, 567, 62 L.Ed.2d 490, 502. Thus, in the so-called "stream of commerce" cases, courts must focus on the acts of the non-resident defendant to see if the defendant has a "substantial connection" with the forum State to support an assertion of personal jurisdiction. *McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223, 226 (1957); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183-84, 85 L.Ed.2d 528, 542-43 (1985). The actions by the defendant must be "purposefully directed toward the forum State." *Asahi Metal Indus. Co. v. Superior Court of California,* 480 U.S. 102, 112, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92, 104 (1987) (plurality opinion) (citing *Burger King,* 471 U.S. 462, 476, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528, 543; *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790, 797 (1984)).

In its most recent tangle with a State long arm statute and the minimum contacts required to constitutionally assert personal jurisdiction, the Court proclaimed:

> The placement of a product into the stream of commerce without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State.... But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Asahi,* 480 U.S. 102, 112, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92, 104.

Unlike the products liability cases from which most of the Supreme Court's pronouncements on personal jurisdiction and the application of state long arm statutes have evolved, the case at bar involves the intentional tort of defamation. The district court relied on *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) to determine that the McNells had the requisite minimum contact with the State of New Hampshire to enable it to assert personal jurisdiction over the McNells. In *Calder* the Supreme Court considered the plight of an editor and reporter of the *National Enquirer,* a Florida corporation which publishes a weekly newspaper with nationwide circulation. The reporter and editor, Florida residents, were defendants in a libel action arising from an article which they respectively wrote and edited. The Supreme Court held that California could assert personal jurisdiction over the nonresident writer and editor because (i) their intentional actions were aimed at the forum State, (ii) they knew that the article was likely to have a devastating impact on the plaintiff, and (iii) they knew that the brunt of the injury would be felt by the plaintiff in the forum State where she lived, worked and the article would have the largest circulation. *Calder,* 465 U.S. 783, 789-90, 104 S.Ct. 1482, 1487, 79 L.Ed.2d 804, 812. The knowledge that the major impact of the injury would be felt in the forum State constitutes a purposeful contact or substantial connection whereby the intentional tortfeasor could reasonably expect to be haled into the forum State's courts to defend his actions. *Id.*

Reading Hugel's complaint in a manner consistent with *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), we conclude that the allegations in Hugel's are sufficient to enable the District Court of

New Hampshire to assert in personam jurisdiction against the nonresident McNells. The complaint sufficiently alleges that the McNells actually directed their actions at a New Hampshire resident. The McNells knew that release of the allegedly false information would have a devastating impact on Hugel, and it can be fairly inferred that they intended the brunt of the injury to be felt in New Hampshire where Hugel had an established reputation as a businessman and public servant.

Specifically the allegations in Hugel's complaint assert that the McNells gave the information to the *Washington Post* reporters with the intent that it be published and thus disseminated nationwide and cause damage to Hugel's reputation in New Hampshire. The intended result of the McNells' contact with the reporters and release of information to them, according to the complaint, was to impugn Hugel's honesty, integrity, and his ability to perform duties as either a public official or businessman.

The McNells urge that the intervening actions of the *Washington Post* and its employees after the McNells met with the reporters determined where their tortious acts were directed and where the brunt of the injury would be felt. But the intervening actions of the reporters and editors of the *Washington Post* are irrelevant to the question of whether New Hampshire can exert personal jurisdiction over the McNells. The complaint alleges that the McNells committed an intentional tort, directed their actions toward the forum state, and knew that the brunt of the devastating blow caused by release of the allegedly libelous material would be felt in the State where Hugel resides and has an established reputation as a businessman and public servant. The district court correctly read the complaint as establishing that the McNells could reasonably expect to be haled into a New Hampshire court to answer for their conduct, and thus the assertion of in personam jurisdiction over the McNells satisfies the dictates of due process.[4]

---

**4.** This case illustrates that the perils of a collateral attack on jurisdiction include the inability

## IV.

### *Service of Process*

■ The McNells' insufficiency argument is essentially that though Hugel complied with the district court's order permitting substituted service, efforts to serve the McNells did not satisfy the requirements of due process. Specifically, the McNells contend that their failure to receive actual notice of Hugel's suit against them deprived them of an opportunity to be heard. The McNells do not claim that Hugel actually knew where they were hiding or could have by some means (presumably superior to those which the Federal Bureau of Investigation were unsuccessfully utilizing) located the McNells. Rather, they suggest that several alternative methods which the court could have ordered Hugel to employ would have succeeded in notifying the McNells of the pending suit.

We cannot agree with the McNells' twisting of the doctrine that notice need not be actual, but rather reasonably calculated to notify parties of the pending suit. *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865, 873 (1950). The McNells' suggested reading of *Mullane* would result in service by publication of a party who cannot be located being constitutionally deficient if one untried method of personal service *might* have been successful in notifying that party. To adopt this view would have the effect of abolishing use of publication as a last ditch effort to notify a missing party of an action against him. Requiring no stone be left unturned in attempting service on a missing person before service by publication can be invoked would, in the words of the district judge, "reward [the] defendants' action of flight.... Due process does not require [a] plaintiff to be a private investigator and determine the actual whereabouts of defendants before commencing an action...." Manuscript opinion at 11. Substituted service by publication was appropriate given Hugel's efforts to effect personal service on the

to challenge the intendment of the complaint under *Conley.*

**6**

McNells and was constitutionally sufficient under *Mullane*.

## V.

### *Rule 60(b)(6)*

■ In challenging the district judge's failure to grant relief from the default judgment under F.R.Civ.P. 60(b)(6) the McNells argue: (i) Hugel used methods of service not reasonably calculated to notify them of the pending lawsuit; (ii) unusual circumstances forced the McNells to go into hiding and thus incur a default judgment; (iii) default judgments are to be avoided at all costs, especially in cases which affect the public interest and there is no prejudice to the plaintiff; and (iv) they have a meritorious defense.

In this Court, disposition of motions to set aside default judgments is within the sound discretion of the district judge, and his decision will not be overturned unless clearly wrong. *Bond Leather Co. v. Q.T. Shoe Mfg. Co.*, 764 F.2d 928, 938 (1st Cir. 1985); *Taylor v. Boston & Taunton Transp. Co.*, 720 F.2d 731, 732 (1st Cir. 1983); *American Metals Service Export Co. v. Ahrens Aircraft, Inc.*, 666 F.2d 718, 720 (1st Cir.1981). The district judge is best placed to weigh the arguments of the parties and the equities of the situation, and thus his decision should be accorded deference. *Bond Leather Co.*, 764 F.2d at 938 (citing *American & Foreign Ins. Ass'n v. Commercial Ins. Co.*, 575 F.2d 980, 983 (1st Cir.1978)). While a party seeking to set aside a default judgment must show good cause for the default and the existence of a meritorious defense, *Bond Leather*, 764 F.2d at 938, it is well settled that Rule 60(b)(6) allows a district judge to grant relief when equitable considerations so counsel. *See generally* 11 Wright & Miller, *Federal Practice and Procedure* ¶ 2864 (1973 & 1989 Supp.).

The district judge rejected the McNells' first 3 [ (i)-(iii) ] arguments after determining that the failure to receive notice and the need to go into hiding resulted from the McNells' own actions.[5] The district judge simply did not believe the McNells' portrayal of themselves as victims of circumstances and the misdeeds of Hugel. It is this type of determination which the district judge is in the best position to judge, and we see no reason to overturn his judgment.

Since existence of a meritorious defense does not require a default judgment to be set aside, we need not decide whether the McNells would have prevailed at trial if indeed they had opted not to evade, in both a civil and criminal sense, the long arm of the law. The district judge correctly determined that he could deny the McNells' Rule 60(b) motion without analyzing the meritorious defense argument.

In summary, though courts have traditionally favored deciding cases on the merits over the imposition of default judgments, the instant case is one instance when a default judgment is appropriate, or at least not inappropriate. The McNells' arguments of lack of personal jurisdiction and insufficient service fail to carry the day, nor did the district judge abuse his discretion by refusing to grant their Rule 60(b) motion for relief from judgment.[6]

AFFIRMED.

---

5. *See* part IV *supra*.

6. We decline to impose sanctions, as requested by Hugel, against the McNells and their attorneys.