**Robert J. BUCKLEY**

v.

**McGRAW–HILL, INC., d/b/a Business Week; Stephen B. Sheppard; William S. Symonds; John W. Patton; Gregory L. Miles; Judith H. Dobrzynski; Michael Schroeder; Joseph Weber.**

**Civ. No. 89–361–D.**

United States District Court, D. New Hampshire.

April 17, 1991.

Gregory A. Holmes, Manchester, N.H., for plaintiff.

William L. Chapman, Concord, N.H., for defendants.

## ORDER

DEVINE, Chief Judge.

Plaintiff brings this defamation action in response to two articles published in *Business Week* magazine in August 1986 and July 1989. Presently before the court is defendants' motion to (1) dismiss for lack of subject matter jurisdiction, (2) dismiss for lack of personal jurisdiction, or (3) transfer this action to the United States District Court for the Western District of Pennsylvania. Defendants also object to the magistrate/judge's Report and Recommendation ("R & R") in which he found, for purposes of diversity jurisdiction under 28 U.S.C. § 1332(a), that plaintiff was a Florida citizen at the time this action was filed.[1] The court's acceptance of the R & R would result in denial of defendants' subject matter jurisdiction claim.

### Background

The following headline dominated the

---

1. The magistrate's finding followed a hearing ordered by this court solely to resolve the citizenship issue.

August 11, 1986, cover of *Business Week*,[2] a McGraw–Hill publication circulated nationwide:

**TROUBLE!**

Robert Buckley, CEO of Allegheny International, runs a very ailing company. It lost $109 million last year, it is mired in debt, and its stock is near a 10–year low. That is bad enough. But in the course of a three-month investigation, Business Week has uncovered well-documented instances of questionable business practices. They include: lavish spending on executive perks, conflicts of interest, and limited disclosure to shareholders. What's going on here?

In July 1989 Buckley and Allegheny again received attention from *Business Week*. This reference came as part of a larger article about corporate directors.

**HORROR STORIES.** But even though some boards today are getting more vigilant ... [h]orror stories of board behavior abound. A classic example: Allegheny International, where former CEO Robert J. Buckley loaded the company with debt from about two dozen acquisitions and used corporate funds to invest in risky energy and real estate ventures. He grew increasingly erratic—for example, firing people indiscriminately and sometimes later rehiring them. To top it all off, he lavished perks on himself and other senior executives.

According to one director, sworn testimony to the SEC reveals that AI's board considered replacing Buckley as early as January, 1985. But directors dithered until a BUSINESS WEEK cover story on AI's troubles hit the newsstands on Aug. 1, 1986. The board fired Buckley on Aug. 8, and Allegheny later declared bankruptcy.

*Business Week* July 3, 1989, cover, p. 68.

Plaintiff filed this action on July 20, 1989, alleging that statements in both articles are false and defamatory.

**2.** The related article inside the August 11, 1986, *Business Week* described various business transactions related to Allegheny International and

## I. Subject Matter Jurisdiction

Section 1332(a) vests this court with "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $50,000, exclusive of interests and costs, and is between ... (1) citizens of different States." Defendants contend that the complete diversity demanded by this statute does not exist here because plaintiff is a citizen of Pennsylvania and, as admitted in the complaint, four of the defendants—Symonds, Schroeder, Miles, and Weber—are also Pennsylvania citizens. Plaintiff maintains that he is a Florida citizen.

■ For diversity purposes, state citizenship is equated with domicile. *Hawes v. Club Ecuestre El Comandante*, 598 F.2d 698, 701 (1st Cir.1979). A person's domicile "is the place where he has his true, fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning." 13B Wright, Miller & Cooper, *Federal Practice and Procedure* § 3612, at 526. Domicile generally requires two elements: (1) physical presence in a state and (2) the intent to make that state a home. 1 Moore, Lucas, Fink, Weckstein & Wicker, *Moore's Federal Practice* ¶ 1.74[3.–1]. "It is the domicile at the time the suit is filed which controls...." *Rodriguez–Diaz v. Sierra-Martinez*, 853 F.2d 1027, 1029 (1st Cir. 1988).

■ When this court first considered the instant motion, it granted defendants' request for a hearing on the disputed issue of plaintiff's citizenship. The magistrate/judge found plaintiff to be a Florida citizen, and defendants object pursuant to 28 U.S.C. § 636(b)(1)(C). For the reasons that follow, the court, after *de novo* review, 28 U.S.C. § 636(b)(1), accepts the magistrate/judge's R & R and finds that plaintiff was a Florida citizen at the time this action was filed.

The facts relevant to plaintiff's citizenship are as follows. In 1972, plaintiff be-

attributed corporate decision-making to the plaintiff.

came president of Allegheny International ("AI") and moved to Sewickley, Pennsylvania. He became chief executive officer of AI in 1978 and left the position shortly after the August 1986 *Business Week* article. He formed Farm Street, Inc., shortly thereafter and leased office space in Pittsburgh. Farm Street was operated solely by plaintiff and was aimed at business acquisition and consulting work. Farm Street retains it corporate existence, but it is presently inactive.

Plaintiff purchased a townhouse in Vero Beach, Florida, in 1981 or 1982. He put the Pennsylvania home up for sale in 1987 and sold it on March 30, 1990, for $1.2 million. His wife bought a home in New York State on the same day. Plaintiff suffered a stroke in June 1990 and continues to be treated medically in New York City.

At the hearing before the magistrate/judge, plaintiff testified that the Vero Beach house was originally used for vacations. He first claimed Florida citizenship in February 1988 when he registered to vote there. Transcript ("Tr.") at 2. Prior to that, he and his wife had a "longstanding plan" to relocate to Florida. *Id.* He left his position at Allegheny in August 1986 and began spending more time in Florida. Tr. 3. He also wanted to eliminate the financial burden of owning the Pennsylvania home. *Id.* The Pennsylvania house was put on the market in 1987. Tr. 5. During 1988 he spent more than seven months in Florida, leaving on business trips and vacations. Tr. 4. These business trips included Farm Street and pending litigation involving AI. He testified that he was "winding down" the Farm Street operation and trying to center his business operations in Florida. Plaintiff had bank accounts in Florida in 1988. Plaintiff also testified that he had listed the Florida address on his federal income tax returns for "several years" and paid taxes levied only against Florida citizens. Tr. 6.

The strongest of defendants' challenges to plaintiff's claim of Florida citizenship before the magistrate/judge involved documents in which plaintiff claimed Pennsylvania "citizenship" or "domicile" at a date near the filing of the instant action. In addition, defendants argue that the findings of the magistrate/judge are inconsistent with each other and are not supported by the evidence. Defendants further object on the ground that the plaintiff's testimony on the issue of intent to make Florida his domicile was not credible due to other alleged inconsistences between his hearing testimony and prior declarations.

Foremost among the defendants' documentary evidence are a motion to transfer and deposition testimony in *SEC v. Buckley,* C. 87–2318, and deposition testimony in *In re Allegheny Int'l,* BK–88–0448. In *SEC v. Buckley,* plaintiff was sued in the United States District Court for the District of Columbia in September 1987. The suit alleges that plaintiff was a Pennsylvania citizen. Plaintiff moved to transfer the case to the Western District of Pennsylvania in October 1987, claiming to be a Pennsylvania citizen.[3] In February 1989, plaintiff was deposed as part of the same suit. His first response to a question concerning his residence was Vero Beach, Florida. When subsequently asked about a Pennsylvania home, he replied he had a "domicile" there. Finally, on July 18, 1989, ten days before the filing of the instant action, plaintiff was deposed in the Western District of Pennsylvania bankruptcy action, *In re Allegheny Int'l.* When asked for his address, plaintiff responded, "Scaife Road, Sewickley, Pennsylvania." Defendants here argue that these statements, together with plaintiff's assertion at the hearing that he "didn't take citizenship seriously," Tr. 22, demonstrate that plaintiff would "change" his citizenship to suit his litigation needs. Defendants' Objection to Magistrate's R & R at 13. Defendants' argument, however, takes plaintiff's remarks out of context.

The following exchanges between plaintiff ("RB") and counsel for both sides

---

**3.** To the extent that an October 1987 declaration of citizenship is relevant to actual citizenship in July 1989, the court considers it in conjunction with the other documentary declarations cited by defendants.

(plaintiff—"GH"; defense—"WC") illustrate plaintiff's explanations of his varied use of the terms at issue.

GH: Mr. Buckley, at some point later in the [February 1989] deposition, did you use the term domicile?

RB: Oh yeah, incorrectly.

GH: Okay, could you explain to the court what your intention was by referring to the word "domicile"?

RB: Just that I had a dwelling, a house, I still had a house in Pennsylvania.

GH: And that when you mentioned domicile you, in your own, excuse me?

RB: I didn't use it as a legal word of art. I'm too long away from law to remember Williams against North Carolina. And I had, I had, domicile and residence mixed up in my mind anyhow. But this thing was corrected, my attorney said you used the wrong word, you should have said you were a citizen of Florida. But this wasn't important to that particular case, and he was supposed to get that changed, but he apparently didn't.

Tr. 7. The comment about taking citizenship seriously was made when plaintiff testified about the October 1987 motion to transfer:

WC: Now, Allegheny International became involved in a Chapter 11 proceeding, did it not?

RB: Mm-hm.

WC: And you filed a proof of claim in that Chapter 11 proceeding?

RB: Right, I believe so.

WC: Is that right? And let me, your honor, if you'll refer to tab C. Tab C purports to be a proof of claim, and on page 3, is that your signature?

RB: Yes.

WC: And it's dated May 4, 1988 and in paragraph 1 of the proof of claim, tell me if I read this correctly, "the undersigned claimant, Robert J. Buckley, is an individual residing at RD 1, Scaife Road, Sewickley" so forth, correct?

RB: Yes.

WC: And that was in May of 1988.

RB: Yes.

WC: That's three months after you registered to vote in Florida?

RB: That's right. I still owned the house in Sewickley, but you know, I didn't notice that or take citizenship that seriously.

Tr. 22.

At page 26 of the hearing transcript, plaintiff explains why at certain times he might have used his Pennsylvania address.

GH: Mr. Buckley, so if someone were to ask you your address while you were in Pennsylvania, would you, if you were ownership of that house, more than likely give the Pennsylvania address:

RB: Yes, we probably were in Pennsylvania, I was probably staying there at least ...

GH: Sir, you're not denying that you made return trips to Pennsylvania while you were living in Florida, are you sir?

RB: Hardly.

GH: You had some things going in Pennsylvania.

RB: Well, I had lawsuits and I had repairs on the house to sell it that had to be supervised from time to time.

GH: In fact, many of the depositions that you have given in the lawsuits were given in Pennsylvania, weren't they?

RB: Yes.

Obviously, plaintiff's credibility is a crucial factor in whether the court accepts his explanation for previous statements indicating Pennsylvania citizenship. Defendants' attack of plaintiff's credibility, however, is weak. For example, defendants argue that in a December 1989 affidavit plaintiff said he had been a Florida citizen for two years, but at the hearing "he changed his testimony," stating that he became a Florida citizen in February 1988. Defendants' Objection at 7. The court cannot find a meaningful difference, for purposes of assessing plaintiff's credibility, between claiming 22 months of Florida citizenship or "two years".

Furthermore, the court, while mindful of the responsibility of *de novo* review, recognizes that the primary function of the hearing was to assess plaintiff's credibility in light of plaintiff's own prior statements which created a factual question as to his

citizenship. The magistrate/judge, who personally observed the plaintiff, found plaintiff's explanations credible. After examining the transcript, the evidence, and defendants' challenges to plaintiff's credibility, the court finds no reason to question the magistrate/judge's findings. *See Blizzard v. Quillen,* 579 F.Supp. 1446 (D.Del. 1984) (credibility findings of magistrate, who personally observed and listened to the testimony of live witnesses, may be accepted unless the district judge, in his *de novo* review, finds reason to question the magistrate's assessment of the evidence).

Plaintiff's citizenship claim is also supported by the testimony and documentary evidence, which indicate that it was late 1987 and early 1988 that plaintiff took affirmative steps establishing Florida citizenship, including registering to vote, Tr. 2, maintaining bank accounts, Tr. 4, and paying taxes, Tr. 16.

The most significant date for purposes of this motion is July 28, 1989, the date the complaint was filed. This court's examination of the record with respect to the "acts of citizenship" taken in Florida supports plaintiff's contention of citizenship as far back as early 1988.

Although the court finds the defendants' remaining objections less meritorious than those already discussed, they will be briefly addressed.

In reference to the plaintiff's Farm Street business, defendants argue that the magistrate/judge was in error to find that plaintiff "was winding down Farm Street operations in Pennsylvania and centering it in Florida," R & R at 4–5, when plaintiff testified that he had no "focus for business activity." Defendants' Objection at 2. The defendants are again mischaracterizing the testimony to demonstrate a purported contradiction between plaintiff's affidavit and testimony. At pages 16–17 of the transcript, the following exchange took place between plaintiff and defense counsel.

WC: In the affidavit that's in front of you, in paragraph 5 you say there that the focus of your business activity is in Florida. Is that correct?

RB: Mm-hm.

WC: But now you've told the court today that in fact you really never carried out any business activity in Florida, isn't that true?

RB: I didn't say that.

WC: Well didn't you say that you were doing business at 1 Gateway Center under the name of Farm Street, Inc. beginning in 1986, isn't that true?

RB: No.

WC: Isn't that what you testified?

RB: I didn't say that. I wasn't at 1 Gateway Center in 1986. I was there in '87 and I said that the business had become more or less dormant and I was looking in the fall of '88–'89 to see if I could get started in Florida. I did look at some things, but that was all I did. I didn't do anything, really. I couldn't get going anywhere.

WC: So you had no focus to any business activity in Florida, did you?

RB: I didn't have any focus for business activity because I wasn't focused on business. I didn't have any business.

The court finds no relevant inconsistency between plaintiff's affidavit statement, "The focus of my business activity is in Florida. I am winding up my business affairs in Pennsylvania and am in the process of closing my office in Pennsylvania.", and his hearing testimony that he was unsuccessful at starting any business in Florida.

Defendants also place undue weight on the fact that when plaintiff's wife took title to the New York home on March 30, 1990, the deed recited her residence as the Pennsylvania address. Aside from the fact that individuals may have several residences at any one time, the claimed residence of plaintiff's wife on March 30, 1990, has little to do with plaintiff's citizenship on July 28, 1989.

In objections number four and five, defendants take issue with the magistrate/judge's characterization that plaintiff's unfocused plan to leave Pennsylvania was "accelerated" by the loss of his job at Allegheny in 1986 and that his plan was "solidified" by his action in putting the

Pennsylvania house up for sale in 1987 and pursuing more activities in Florida. Defendants first claim that the "acceleration" is inconsistent with plaintiff's centering a business in Pittsburgh for "two to three years". Defendants' Objection at 3. The court disagrees. The testimony shows that the Pittsburgh business was dormant in 1987, after which plaintiff attempted to find business in Florida. *See supra* at 435. Next, the magistrate/judge's finding that putting the Pennsylvania house up for sale in 1987 solidified his Florida plans is not inconsistent with a 1987 claim of Pennsylvania citizenship, especially given the dubious relevance of a 1987 declaration to a situation almost two years later. His plan was to reside in Florida. Putting the Pennsylvania house up for sale would certainly solidify that plan, even though plaintiff might still be a Pennsylvania citizen.

Defendants' final semantic shot is that the magistrate/judge's finding that the Florida plan was not "culminated" until 1990 somehow undercuts the finding of Florida citizenship in July 1989. In the court's view, the magistrate/judge was obviously referring to the fact that it was not until March 1990 that plaintiff sold his Pennsylvania home, thus cutting the final link to his former residence. This in no way means that plaintiff could not have been a Florida citizen prior to the sale, however.

Defendants would like to create ambiguity with respect to the words "accelerated", "solidified", or "culminated", where the court can find none. Therefore, the court accepts the magistrate/judge's Report and Recommendation, finding plaintiff to be a Florida citizen on or before July 29, 1989. Accordingly, the court finds that it does have subject matter jurisdiction over this matter, there being complete diversity between the parties.

## II. Personal Jurisdiction

When personal jurisdiction is challenged, the plaintiff assumes the burden of making a prima facie showing that this court can exercise jurisdiction. *Kowalski v. Doherty, Wallace, Pillsbury & Murphy*, 787 F.2d 7, 8 (1st Cir.1986). The court may assert *in personam* jurisdiction over nonresident defendants only if plaintiff can show that defendants are subject to the applicable New Hampshire long-arm statute,[4] and that assertion of jurisdiction is consistent with the due process, or minimum contacts, requirements of the United States Constitution. This is a two-step process—the constitutional analysis is not reached unless plaintiff first establishes that the state long-arm criteria have been met. *Id.* at 10; *Buckley v. Bourdon*, 682 F.Supp. 95, 98 (D.N.H.1988).

■ To satisfy the long-arm statute, each nonresident defendant must have committed a tortious act within the state.[5] This requirement can be met where injury occurs in New Hampshire as the result of acts outside the state. *Hugel v. McNell*, 886 F.2d 1, 3 (1st Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1808, 108 L.Ed.2d 939 (1990); *Tavoularis v. Womer*, 123 N.H. 423, 426, 462 A.2d 110, 112 (1983). In the libel context, even if the alleged libel took place outside New Hampshire, the long-arm statute would be satisfied if the complaint alleges that plaintiff suffered injury to his reputation in New Hampshire. *Id.* Defendants argue that the complaint is defective here in that it "does not allege any

---

**4.** As corporate defendant McGraw–Hill has conceded personal jurisdiction, only the individual defendants' objections remain. The applicable long-arm statute is New Hampshire Revised Statutes Annotated ("RSA") 510:4, which states,

**510:4  Nonresident Defendant.**
 I. JURISDICTION. Any person who is not an inhabitant of this state and who, in person or through an agent, transacts any business within this state, commits a tortious act within this state, or has the ownership, use, or possession of any real or personal property situated in this state submits himself, or his

personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from or growing out of the acts enumerated above.

**5.** At the time relevant to this action, defendant Sheppard was *Business Week*'s editor-in-chief, Symonds was manager of the McGraw–Hill Pittsburgh office and an investigative reporter, Patton was *Business Week*'s publisher, and Dobrzynski, Schroeder, Miles, and Weber were investigative reporters.

injury in New Hampshire." Motion to Dismiss or in the Alternative Transfer at 14. Defendants, however, have overlooked the definition of libel injury stated by the United States Supreme Court in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), a case, like the instant case, in which neither party had any apparent connection to New Hampshire.

> False statements of fact harm both the subject of the falsehood *and* the readers of the statement. New Hampshire may rightly employ its libel laws to discourage the deception of its citizens. There is "no constitutional value in false statements of fact." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974).
>
> New Hampshire may also extend its concern to the injury that in-state libel causes within New Hampshire to a nonresident. The tort of libel is generally held to occur wherever the offending material is circulated. Restatement (Second) of Torts § 577A, Comment *a* (1977). The reputation of the libel victim may suffer harm even in a State in which he has hitherto been anonymous. The communication of the libel may create a negative reputation among the residents of a jurisdiction where the plaintiff's previous reputation was, however small, at least unblemished.

*Id.* 465 U.S. at 776–77, 104 S.Ct. at 1479 (footnote omitted).

Here, the complaint alleges that *Business Week* is circulated throughout all of the United States, "including the State of New Hampshire." Complaint at ¶ 2. *See also* Complaint at ¶ 13. Plaintiff also alleges throughout the complaint that the articles in question were false and injurious. Based on the complaint and the above-cited language in *Keeton*, the court finds that plaintiff has sufficiently alleged a "tortious act within the state" to bring the individual defendants within the reach of the New Hampshire long-arm statute.

■ Due process "permits personal jurisdiction over a defendant in any State with which the defendant has 'certain minimum contacts ... such that maintenance of the suit does not offend "traditional notions of fair play and substantial justice." ' " *Calder v. Jones*, 465 U.S. 783, 788, 104 S.Ct. 1482, 1486, 79 L.Ed.2d 804 (1984) (citation omitted) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)). In judging minimum contacts, the court must examine " 'the relationship among the defendant, the forum, and the litigation.' " *Keeton, supra*, 465 U.S. at 775, 104 S.Ct. at 1478 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 2579–80, 53 L.Ed.2d 683 (1977)).

In *Calder v. Jones, supra*, plaintiff, a professional entertainer who lived and worked in California, brought a libel action in a California court against a reporter and an editor of the *National Enquirer*, both of whom were Florida residents. The Supreme Court held that the California court could properly assert personal jurisdiction over the nonresident writer and editor involved in the libelous story, which focused on the alleged California activities of the California plaintiff. *Id.* at 788–89, 104 S.Ct. at 1486–87.

The court reasoned that jurisdiction was proper in California based on the "effects" of defendants' Florida conduct in California. *Id.* at 789, 104 S.Ct. at 1486–87 (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98, 100 S.Ct. 559, 567–68, 62 L.Ed.2d 490 (1980)). However, the court cautioned that the mere fact that the defendants could foresee that the article would be circulated and have an effect in California was not sufficient for an assertion of jurisdiction (citing *World–Wide, supra*, at 295, 100 S.Ct. at 566). Instead, the court said that the defendant's

> intentional, and allegedly tortious, actions were expressly aimed at California. Petitioner South wrote and petitioner Caldwell edited an article that they knew would have a potentially devastating impact upon respondent. And they knew that the brunt of that injury would be felt by respondent in the state in which she lives and in which the National Enquirer has its largest circulation. Under

the circumstances, petitioners must "reasonably anticipate being haled into court there" to answer for the truth of the statements made in their article. *Id.* 465 U.S. at 789–90, 104 S.Ct. at 1487 (citing and quoting *World–Wide, supra,* 444 U.S. at 297, 100 S.Ct. at 567) (citing *Kulko v. California Supreme Court,* 436 U.S. 84, 97–98, 98 S.Ct. 1690, 1699–1700, 56 L.Ed.2d 132 (1978); *Shaffer v. Heitner, supra,* 433 U.S. at 216, 97 S.Ct. at 2586).

The First Circuit Court of Appeals applied *Calder* in *Hugel v. McNell, supra,* a libel action filed in this court by a New Hampshire citizen against a nonresident who provided allegedly libelous information to the *Washington Post.* The *Hugel* court upheld jurisdiction, finding that

> [t]he complaint sufficiently alleges that the McNells actually directed their actions at a New Hampshire resident. The McNells knew that the release of the allegedly false information would have a devastating impact on Hugel, and it can be fairly inferred that they intended the brunt of the injury to be felt in New Hampshire where Hugel had an established reputation as a businessman and public servant.

*Id.* at 5.

Based on *Calder* and *Hugel,* defendants argue, personal jurisdiction is only permissible when the allegedly libelous material is "aimed at the forum State" and the defendant knows "the major impact of the injury would be felt" there. Defendants' Supplemental Memorandum of Law at 4–5 (quoting *Hugel, supra,* 886 F.2d at 4; *Laxalt v. McClatchy,* 622 F.Supp. 737 (D.Nev.1985)). However, adding the reasoning of *Keeton v. Hustler, supra,* to the mix leads this court to the conclusion that personal jurisdiction over the defendants in this case is consistent with the Due Process Clause.

Here, as in *Keeton,* none of the parties have any apparent connection to New Hampshire. This fact, however, as discussed previously, does not mean that plaintiff did not suffer injury in New Hampshire. *Keeton, supra,* 465 U.S. at 777, 104 S.Ct. at 1479–80. That the "brunt of the injury" in *Hugel* and *Calder* oc-

curred in the forum state, or that defendants aimed their conduct at the forum state, were factors coincidental to the plaintiff's residence in the forum state. And, as the court pointed out in *Keeton,*

> The plaintiff's residence is not, of course, completely irrelevant to the jurisdictional inquiry. As noted, that inquiry focuses on the relations among the defendant, the forum, and the litigation. Plaintiff's residence may well play an important role in determining the propriety of entertaining a suit against the defendant in the forum. That is, plaintiff's residence in the forum may, because of defendant's relationship with the plaintiff, enhance defendant's contacts with the forum. Plaintiff's residence may be the focus of the activities of the defendant out of which the suit arises. But plaintiff's residence in the forum State is not a separate requirement, and lack of residence will not defeat jurisdiction established on the basis of defendant's contacts.
>
> It is undoubtedly true that the bulk of the harm done to petitioner occurred outside New Hampshire. But that will be true in almost every libel action brought somewhere other than the plaintiff's domicile. there is no justification for restricting libel actions to the plaintiff's home forum.

*Id.* at 780, 104 S.Ct. at 1481 (footnote and citations omitted).

The court went on to find jurisdiction over *Hustler* appropriate because it deliberately exploited the New Hampshire market and therefore could reasonably anticipate being haled into court there in a libel action based on the contents of the magazine. *Id.* at 781, 104 S.Ct. at 1481–82.

In the instant case, the individual defendants' allegedly tortious conduct was aimed specifically at plaintiff. This conduct caused the type of injury that occurs wherever the defamation was distributed. The individual defendants, all of whom had a direct hand in the writing and publication of the articles in question for a nationally distributed magazine, must reasonably anticipate being haled into court in a libel

action where injury to the targeted plaintiff can be expected to occur, which in this case included New Hampshire. Accordingly, the court finds that it may assert *in personam* jurisdiction over the individual defendants, and therefore the motion to dismiss under Rule 12(b)(2), Fed.R.Civ.P., is denied.

### III. Transfer

Defendants finally contend that this action should be transferred to the Western District of Pennsylvania pursuant to 28 U.S.C. § 1404(a), which provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any action to any other district or division where it might have been brought."

■ The convenience of the parties and witnesses and the availability of documents needed for evidence are factors a district court must consider in resolving whether to grant a motion to transfer under section 1404(a). *Cianbro Corp. v. Curran–Lavoie, Inc.*, 814 F.2d 7, 11 (1st Cir.1987). However, a defendant moving to transfer an action is faced with the substantive burden of having to show that these factors predominate in favor of transfer. The Supreme Court has held that "[u]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947). Transfer is inappropriate if the effect is merely to shift inconvenience from one party to the other. *See generally* 15 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction (Second)* § 3848 (and cases therein cited). Moreover, "amorphous allegations of need as to unnamed witnesses and unspecified documents are inadequate to satisfy the mandate of *Gulf Oil Corp.* that there be a clear showing that a balancing of conveniences *strongly* favors the granting of a motion." *Crosfield Hastech, Inc.*

*v. Harris Corp.*, 672 F.Supp. 580, 589 (D.N.H.1987) (citations omitted).

■ In support of their motion, defendants make the following assertions regarding the convenience of the parties. First, defendants argue that because plaintiff chose a Pennsylvania state court for a 1987 action involving most of the same matters as here, Pennsylvania is necessarily a convenient forum for this litigation. Second, defendants argue that the "operative facts" of the case bear little or no relation to New Hampshire, therefore plaintiff's forum choice should carry less weight than usual. Motion to Dismiss at 18. Finally, defendants argue that New Hampshire is equally inconvenient to both parties because of difficulty in presenting testimonial and documentary evidence that will be drawn principally from the Western District of Pennsylvania. *Id.* at 18–19.

Defendants' argument as to witness convenience focuses on the fact that records custodians and AI executives who will testify as to plaintiff's management record, *Business Week* interviewees, and testimonial evidence of damage to plaintiff's reputation are, for the most part, located in Western Pennsylvania. *Id.* at 19. In addition, defendants assert that the bulk of the documentary evidence is located at AI headquarters in Pittsburgh.[6]

Defendants also argue that the interests of justice would be served by transferring this action to the Western District of Pennsylvania, where several suits are already pending involving the plaintiff and which arise out of the same facts and circumstances reported in the 1986 *Business Week* article. *Id.* at 20.

In response, plaintiff first alleges that several of the witnesses and defendants in this case who resided in Pennsylvania when this suit was brought have since relocated, thus diminishing any convenience to them in Pennsylvania. Plaintiff also argues that his right to a fair trial could be compromised in Western Pennsylvania, where de-

---

**6.** This evidence includes records of business expenses, investments, investment analyses, hiring practices, employment records, and correspondence between AI and *Business Week,* as well as over 3,300 documents gathered by *Business Week* in its investigation of plaintiff and AI. Motion to Dismiss at 19–20.

fendants would be able to "reap the benefits of the harm already committed" against plaintiff. Objection to Defendants' Motion at 15–16.

The court finds that defendants have not met their substantial burden. To begin with, plaintiff's choice of forum must be given some weight as to convenience, even if the court accepts defendants' argument that the factual center of this case is Pennsylvania. 15 Wright, Miller & Cooper, *supra*, § 3843 n. 15. Defendants argue further that it would be difficult to present in New Hampshire documentary evidence that is located in Western Pennsylvania. Defendants' inconvenience in transporting documents from Pennsylvania to New Hampshire, which would presumably be expressed in terms of costs, is however offset by the relative financial strength of the corporate defendant. *See Galonis v. NBC*, 498 F.Supp. 789, 493 (D.N.H.1980) (court may give some weight to relative financial strength of the parties in evaluating convenience).

The most important factor in deciding whether to transfer an action is the convenience of witnesses. 15 Wright, Miller & Cooper, *supra*, § 3851 n. 1 (and cases therein cited). There is a sharp dispute as to whether transfer of this action will serve to bring important witnesses within compulsory process of the Pennsylvania court or any other court. In addition, neither side has made anything more than general allegations about the identity and location of witnesses who would be inconvenienced. *See Omni Hotels Mgmt. Corp. v. Round Hill Dev.*, 675 F.Supp. 745, 752 (D.N.H. 1987) (conclusory allegations of unnamed witnesses insufficient to meet movant's burden) (citing *Gulf Oil, supra*, 330 U.S. at 510–11, 67 S.Ct. at 843–44); *cf. J.I. Kislak Mortgage Corp. v. Connecticut Bank & Trust Co.*, 604 F.Supp. 346, 348 (S.D.Fla. 1985) (citations omitted)).

Finally, the interests of justice do not necessarily militate in favor of transfer. Defendants argue that there are currently six consolidated shareholder suits against plaintiff, as well as SEC litigation in the Western District of Pennsylvania, all arising out of the facts reported by *Business Week*. Additionally, plaintiff's son filed a libel action there over the same articles, with which defendants would request consolidation upon transfer.

Where identical actions are proceeding concurrently in two federal courts, entailing duplicative litigation and a waste of judicial resources, the first-filed action is generally preferred in a choice-of-venue decision. *Cianbro Corp., supra*, 814 F.2d at 711. Unlike *Cianbro*, where identical parties filed suit in different courts over a single disputed contract, here the defendants are not parties to most of the Pennsylvania actions. Although plaintiff's actions at AI will be the sole focus of the Pennsylvania shareholder and SEC suits, the instant action will go beyond plaintiff's activities to consider the acts of defendants.

The court finds that defendants have not demonstrated that the balance of conveniences would be tipped by transfer. Accordingly, the court denies the motion to transfer.

## Conclusion

For the foregoing reasons, the court accepts and approves the magistrate/judge's Report and Recommendation (document no. 37), denies defendants' objections thereto (document no. 40), and thereby finds plaintiff to be a Florida citizen for purposes of diversity jurisdiction. In addition, the court denies defendants' motion to dismiss for lack of personal jurisdiction or, in the alternative, to transfer (document no. 7).

SO ORDERED.