Hillsborough-southern judicial district
No. 95-214

## BROTHER RECORDS, INC. & a.

v.

## HARPERCOLLINS PUBLISHERS & a.

September 25, 1996

*Upton, Sanders & Smith*, of Concord (*Kimberly Kirkland* on the brief) and *Flynn, Sheridan & Tabb*, of Boston, Massachusetts (*Michael Tabb* on the brief and orally), for the plaintiffs.

*Gagliuso & Gagliuso, P.A.*, of Nashua (*Richard C. Gagliuso* and *Kelly J. Gagliuso* on the brief, and *Mr. Gagliuso* orally), for defendants Brian D. Wilson, Todd Gold, and Brains and Genius.

HORTON, J. Three of the defendants, Brian D. Wilson, by and through the conservator of his estate and person (Wilson), Todd Gold (Gold), and Brains and Genius (B & G), who will be collectively referred to as "the defendants," appeal the order of the Superior Court (*Murphy*, J.) denying their motions to dismiss. We affirm.

This case arises out of the publication of the book WOULDN'T IT BE NICE, published by HarperCollins Publishers and written by defendants Wilson and Gold. The book is an autobiography of Wilson, one of the founding members of the music group, The Beach Boys. The plaintiffs, Alan Jardine, Brother Records, Inc., and Brother Tours, Inc., sued HarperCollins Publishers, Eugene Landy, and the defendants in superior court alleging libel and related torts. Jardine is a member of The Beach Boys. Brother Records, Inc. and Brother Tours, Inc. are the two California corporations through which the Beach Boys conduct business. Landy is a psychologist who treated Wilson for many years. B & G, which owns the copyright to the book, is a California partnership consisting of Wilson and Landy. It hired Gold to write the manuscript and selected HarperCollins to publish the book.

The defendants appeared specially and moved separately to dismiss for lack of personal jurisdiction. They argued that New Hampshire has virtually no connection with the parties or the subject matter of the action and that they lacked contacts with New Hampshire sufficient to justify the exercise of jurisdiction over them by the superior court. The superior court ruled that each defendant had sufficient "minimum contacts" with New Hampshire such that the State's exercise of jurisdiction over them would not offend "traditional notions of fair play and substantial justice." *Internat. Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *see Phelps v. Kingston*, 130 N.H. 166, 170, 536 A.2d 740, 742 (1987). The defendants appealed.

■ A court's exercise of personal jurisdiction over a foreign defendant typically implies a two-part inquiry. Jurisdiction must be authorized, first, under the State's long-arm statute, and second, under the due process clause of the fourteenth amendment to the United States Constitution. *See Weld Power Industries v. C.S.I. Technologies*, 124 N.H. 121, 125, 467 A.2d 568, 570 (1983). Because the defendants concede that they fall within the bounds of New Hampshire's long-arm statute applicable to individual foreign defendants, *see* RSA 510:4, I (1983), we need only determine whether the "assertion of jurisdiction is consistent with the due process, or minimum contacts, requirements of the United States Constitution." *Buckley v. McGraw-Hill, Inc.*, 762 F. Supp. 430, 436 (D.N.H. 1991); *see Phelps*, 130 N.H. at 170, 536 A.2d at 742. Our inquiry is guided by the United States Supreme Court:

> The Due Process Clause of the Fourteenth Amendment to the United States Constitution permits personal jurisdiction over a defendant in any State with which the defendant has "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' *Milliken v. Meyer*, 311 U.S. 457, 463 [(1940)]." *International Shoe*. In judging minimum contacts, a court properly focuses on "the relationship among the defendant, the forum, and the litigation." *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977). See also *Rush v. Savchuk*, 444 U.S. 320, 332 (1980). The plaintiff's lack of "contacts" will not defeat otherwise proper jurisdiction, see *Keeton v. Hustler Magazine, Inc.*, [465 U.S. 770, 779–81 (1984)], but they may be so manifold as to permit jurisdiction when it would not exist in their absence.

*Calder v. Jones*, 465 U.S. 783, 788 (1984).

■ "The plaintiff[s] bear[] the burden of *demonstrating* facts sufficient to establish personal jurisdiction over the defendant[s]." *Phelps*, 130 N.H. at 170, 536 A.2d at 742 (emphasis added). This holds true despite the general rule for dismissal on failure to state a claim that "on a motion to dismiss, all facts properly pleaded by the plaintiff are deemed true, and all reasonable inferences derived therefrom are construed most favorably to the plaintiff." *Weld Power Industries*, 124 N.H. at 123, 467 A.2d at 569. Thus, when jurisdictional facts are challenged, *see, e.g.*, *Venetian Salami Co. v. Parthenais*, 554 So. 2d 499, 502 (Fla. 1989), "[p]laintiffs must not only plead facts sufficient to support jurisdiction, but must also go beyond the pleadings and make affirmative proof." *Lex Computer &*

*Mgmt. v. Eslinger & Pelton, P.C.*, 676 F. Supp. 399, 402 (D.N.H. 1987); *see, e.g., Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 145–47 (1st Cir. 1995). "However, plaintiffs need make only a prima facie showing of jurisdictional facts to avoid defendants' motion to dismiss." *Lex Computer*, 676 F. Supp. at 402.

## I. Minimum Contacts

"'Each defendant's contacts with the forum state must be assessed individually.'" *Estabrook v. Whetmore*, 129 N.H. 520, 524, 529 A.2d 956, 959 (1987) (quoting *Calder*, 465 U.S. at 790). In order for the exercise of jurisdiction to be proper, the nature of those contacts must be "such that it is 'reasonable' and 'fair'" to subject the defendant to the court's jurisdiction. *Tavoularis v. Womer*, 123 N.H. 423, 426–27, 462 A.2d 110, 113 (1983). The contacts are sufficient if the defendant's activity outside the State had "reasonably foreseeable consequences within the forum State," *id.* at 427, 462 A.2d at 113, and if "it was reasonably foreseeable that the defendant would be sued in New Hampshire," *id.* at 428, 462 A.2d at 113–14. The defendants' contacts thus warn them of the possibility of a law suit. The contacts must, however, be more than fortuitous, *id.* at 427, 462 A.2d at 113; *see World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980); they must be "purposefully directed toward the forum State," *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 112 (1987) (emphasis omitted); *see Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Phelps*, 130 N.H. at 172, 536 A.2d at 743. In other words, the defendants must have "purposefully avail[ed themselves] of the privilege of conducting activities within the forum state." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). In addition, in the absence of "continuous and systematic" contacts with the forum state, *Perkins v. Benguet Mining Co.*, 342 U.S. 437, 438 (1952), the controversy must arise out of the defendants' contacts with the forum. *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414–16 (1984). "When a nonresident defendant performs allegedly tortious acts in New Hampshire, little doubt clouds a finding that New Hampshire has jurisdiction." *Estabrook*, 129 N.H. at 523, 529 A.2d at 958.

The defendants argue that the plaintiffs failed to demonstrate sufficient contacts between the defendants and New Hampshire because the plaintiffs failed to show that the defendants purposefully directed their activities at New Hampshire. They argue that the trial court failed to recognize the distinction between foreseeable consequences of the defendants' actions and purposefully directed actions.

Specifically, Wilson argues that his involvement with the book was extremely limited: he participated in thirty to forty hours of interviews with Gold and skimmed through a draft of the book prior to publication. He also argues that promotional media interviews which may have aired in New Hampshire were not activities related to the libel claim and, therefore, are not part of the jurisdictional analysis. He maintains that under the plaintiffs' version of the facts, he was manipulated by others and, therefore, could not have purposefully directed his activity toward New Hampshire.

Gold argues that after researching and writing the manuscript, his role was limited to incorporating comments made by Landy and Wilson. He states that his work on the book took place entirely in California and did not bring him into contact with New Hampshire, that the people and events about which he wrote did not involve New Hampshire, and that he could not have anticipated that any injury caused by his conduct would have occurred in this State. He further argues that the distribution and sale of the book in New Hampshire was controlled by HarperCollins and that he played no role in the selection of a publisher or the decisions of where and when to publish.

B & G argues that the only demonstrated details of its involvement with the book are contained in collaboration and publication agreements. The agreements show that B & G hired Gold to write the manuscript over which B & G retained control and that the details of publication, distribution, and promotion would be determined by HarperCollins. B & G challenges the court's inference that Landy's activities were attributable to the partnership and argues that any relevant acts directed at New Hampshire were undertaken by HarperCollins rather than by B & G.

 In this case, the plaintiffs demonstrated that the defendants purposefully directed their activities at New Hampshire residents. Wilson is credited with authorship on the cover of the book. The manuscript is based on interviews with him, and he had the discretion, under the terms of the collaboration agreement, to make "changes, additions, and eliminations" as he desired or deemed necessary. The agreement specified that the book would be released "through normal retail channels in the United States," and the agreement was signed by Gold and Wilson. In addition, Wilson was contractually bound to participate in a nationwide promotional tour which was to include appearances on "major network TV shows and at the American Booksellers Association convention." Moreover, Wilson acknowledged that he was *personally* bound by the publishing agreement and that he was "personally responsible for the performance of the Partnership."

Gold researched and wrote the manuscript and incorporated changes made by Wilson and Landy. The collaboration agreement between Gold and B & G specifies that his services would be required until the book's general release "throughout the United States through normal retail channels."

B & G hired Gold to prepare the manuscript and contracted with HarperCollins to publish the book. Under the terms of the collaboration agreement, all services performed by Gold were to be done under B & G's direction and supervision, and drafts of the book were to be submitted to it and were subject to its approval. Pursuant to the publishing agreement, B & G retained the right to review proofs and other production materials prior to publication. B & G granted HarperCollins the exclusive right to "print, publish and sell [the book] . . . throughout the United States, its territories, dependencies and possessions, Canada, [and] the Philippine Islands." In short, B & G maintained exclusive control over every aspect of the project.

The defendants are the parties directly responsible for the content of the book. The facts in this case are quite unlike those in *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201 (1st Cir. 1994), a case on which the defendants rely. The defendant in *Ticketmaster* was a "journalistic source" and not the author of the offending work. *Id.* at 203–04. The court stated that

> when the defendant in a defamation action is a journalist's source, the link between the defendant's conduct and the cause of action is attenuated by the intervening activities of third parties, *e.g.*, the reporter, the editor, the media outlet, and that those intermediaries shape, amplify, and occasionally distort the original utterance.

*Id.* at 207. Here, in contrast, Gold and Wilson are the authors of the book and were hired by B & G, which had control over the project.

The defendants' ultimate goals regarding the book included nationwide distribution and sale. The book was intended for fans who collectively had purchased over 200,000,000 Beach Boys albums during the past three decades. This market included New Hampshire, where the Beach Boys had performed several times in recent years. Moreover, the parties agree that the book was distributed and sold in New Hampshire. "It is undoubtedly true that the bulk of the harm [allegedly] done to [the plaintiffs] occurred outside New Hampshire. But that will be true in almost every libel action brought somewhere other than the plaintiff[s'] domicile. There is no justification for restricting libel actions to the plaintiff[s'] home forum." *Keeton*, 465 U.S. at 780. Here, the defendants deliberately

exploited the New Hampshire market. *See id.* at 781. Each knew the book would be distributed and sold nationally, and each stood to profit from the sale of books in New Hampshire.

## II. Fair Play and Substantial Justice

■ In addition to determining whether minimum contacts exist, the court must determine whether these contacts, in light of other factors, justify the exercise of personal jurisdiction such that traditional notions of "fair play and substantial justice" are not offended. *Burger King*, 471 U.S. at 476; *see Phelps*, 130 N.H. at 172, 536 A.2d at 742. Thus the court may consider

> the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff[s'] interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies.

*Phelps*, 130 N.H. at 172, 536 A.2d at 743 (quotations omitted). These "gestalt factors," *Kopf v. Chloride Power Electronics, Inc.*, 882 F. Supp. 1183, 1195–96 (D.N.H. 1995); *Ticketmaster*, 26 F.3d at 209–10, "sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Phelps*, 130 N.H. at 172, 536 A.2d at 743 (quotation omitted).

■ The defendants argue that even if sufficient contacts exist, New Hampshire's exercise of jurisdiction over them would violate the due process clause. The Supreme Court has held, however, that a State's interest in adjudicating a dispute extends to libel actions brought by nonresidents because libel harms "both the subject of the falsehood *and* the readers of the statement." *Keeton*, 465 U.S. at 776. Thus "New Hampshire may rightly employ its libel laws to discourage the deception of its citizens," *id.*, even in order to remedy "the injury that in-state libel causes within New Hampshire to a nonresident," *id.* at 776–77.

> The tort of libel is generally held to occur wherever the offending material is circulated. The reputation of the libel victim may suffer harm even in a State in which he has hitherto been anonymous. The communication of the libel may create a negative reputation among the residents of a jurisdiction where the plaintiff's previous reputation was, however small, at least unblemished.

*Id.* at 777 (citation and footnote omitted).

■ This principle applies to the facts of this case. That the parties have no apparent connections to New Hampshire does not mean that the plaintiffs did not suffer injury in New Hampshire. *See Buckley*, 762 F. Supp. at 438. "The individual defendants, all of whom had a direct hand in the writing and publication of [a nationally distributed book], must reasonably anticipate being haled into court in a libel action where injury to the targeted plaintiff[s] can be expected to occur, which in this case included New Hampshire." *Id.* at 438–39.

Due to the nature of the claim of libel, and because we find that the defendants' activities were purposefully directed at New Hampshire, the superior court's jurisdiction over the defendants comports with "traditional notions of fair play and substantial justice." Accordingly, we find that the trial court's denial of each defendant's motion to dismiss was not in error.

*Affirmed.*

All concurred.