George F. NOONAN and
Anne Marie Noonan

v.

The WINSTON COMPANY; R.J. Reynolds Tobacco Company; R.J. Reynolds Tobacco International, Inc.; Lintas: Worldwide; Lintas: Paris; Worldwide Brands, Inc.; and Colour Library Books Ltd.

Civ. A. No. 94–11071–RGS.

United States District Court,
D. Massachusetts.

Sept. 25, 1995.

---

Judith Kemp, Milton, MA, Michael Lurie, Alex MacDonald, H. Bissell Carey, III, Boston, MA, for plaintiffs.

David R. Friedman, Susan Murphy, Boston, MA, Robert M. Callagy, New York City, for defendants.

Walter H. Mayo, III, Boston, MA, Ralph Gregory Elliot, Hartford, CT, for Color Library Books Ltd.

*MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AND PLAINTIFFS' MOTION TO AMEND THE COMPLAINT*

STEARNS, District Judge.

This case was precipitated by the publication in France of a Winston cigarette ad in the summer of 1992. The ad featured a picture of the plaintiff, George F. Noonan, a Boston mounted patrol officer. Noonan, who had not given permission for the use of his likeness, brought this lawsuit seeking monetary and injunctive relief on claims of misappropriation, violation of the Massachusetts statutory right to privacy (M.G.L. c. 214, § 3A), defamation, common law invasion of privacy, reckless infliction of emotional distress, and deceptive business practices (M.G.L. c. 93A). Noonan's wife, Anne Marie Noonan, brought a companion claim for loss of consortium. Before the court are defendants' motions to dismiss for want of personal jurisdiction,[1] and a motion by Noonan to amend the Complaint.

### FACTS

The well supported facts are these.[2] Noonan, a twenty year veteran of the Boston Police Department, has devoted himself to anti-smoking campaigns sponsored by his employer, the City of Boston. His zeal has earned him the sobriquet "Boston's anti-smoking czar." Sometime between 1978 and 1980, an unnamed photographer took a picture of Noonan while he was on mounted patrol in front of Faneuil Hall.[3] In the picture, Noonan is easily recognizable as a Boston police officer. The "Boston Police" insignia is visible on the left shoulder of his jacket and on the saddle blanket of his horse. The picture was to be included in a book published by the defendant Colour Library Books, Ltd. (CLB) entitled *Boston: City of Many Dreams.* The photograph, however, appeared in another CLB book, *An American Moment,* distributed in Europe and the United States.[4] CLB is a United Kingdom corporation with a principal place of business in Surrey, England. Employees of CLB travel to, and conduct business in Massachusetts, in person, through the mails, and over the telephone.[5] No one ever sought, or obtained, Noonan's permission to use his photograph.

In 1992, CLB sold what it represented as its "rights" to Noonan's photograph to the defendant Lintas: Paris for 1,800 British pounds (approximately $2,900). Lintas: Paris is a French advertising agency with its only office in Paris, France.[6] Lintas: Paris

---

1. Two motions to dismiss have been filed, one by Colour Library Books, Ltd. (CLB), and a second by all of the other defendants (referred to by Noonan as "the tobacco defendants").

2. See *Chlebda v. H.E. Fortna & Brother, Inc.,* 609 F.2d 1022, 1024 (1st Cir.1979).

3. Noonan speculates that the photographer was either an employee or agent of CLB. CLB disputes this supposition.

4. CLB denies any role in the American publication.

5. CLB denies that it has transacted business in Massachusetts, but it does not specifically deny that its employees or agents have sent letters, made telephone calls, and travelled to Massachusetts for business purposes.

6. Defendant Lintas: Worldwide is not a legal entity, but rather an associational name used by a group of affiliated advertising agencies which are incorporated in different countries. Each agency conducts business in the country of its incorporation. Promotional literature distributed by Lintas: Worldwide gives the reader the impression that the separate Lintas companies

told CLB that it intended to use the photograph in connection with a "Winston advertising campaign." Lintas: Paris did not adhere to the industry practice of obtaining a copy of a release from the subject of the photo. The Lintas: Paris advertising campaign had been commissioned by R.J. Reynolds France, S.A. (RJR France). RJR France is a French corporation (named as a defendant in the Amended Complaint) with its principal place of business in Nanterre, France. RJR France hired Lintas: Paris to promote an entertainment service it owns called the "The Winston Way." The Winston Way is sponsored by "Eurofinacom," a corporation affiliated with RJR France. RJR France is an affiliate of the defendant R.J. Reynolds Tobacco Company (RJRTC). RJRTC, a New Jersey corporation with a principal place of business in Winston–Salem, North Carolina, is registered to do business in Massachusetts, has an appointed agent to receive service of process, and has two registered Massachusetts lobbyists on its payroll. Defendant R.J. Reynolds Tobacco International, Inc. (RJRTI), is a Delaware corporation with a principal place of business in Winston–Salem, North Carolina. RJRTI acts as the headquarters and central manager for affiliated corporate entities located throughout the world, including RJR France and RJRTC. Defendant Worldwide Brands, Inc. (WBI), is a Delaware corporation engaged in the worldwide acquisition and marketing of trademarks. RJR France, RJRTC, RJRTI, and WBI are wholly-owned subsidiaries of R.J.R. Nabisco, Inc. (not a party to this suit). There is nothing presently in the record tending to demonstrate the existence of an entity known as "The Winston Company," also a named defendant.

The Winston Way is one of several information retrieval services available through an interactive telephone network in France called Le Minitel. Le Minitel provides French subscribers with consumer information transmitted over video screens connected to their telephones. It is not available outside of France. One of the advantages of promoting a product on Le Minitel is that the sponsor has considerable latitude in selecting the screen images that appear with the broadcast information. The Winston Way, for example, provides viewers with restaurant and entertainment reviews superimposed on cigarette-related images, icons, slogans and symbols. The intended effect is to create an association between entertainment and smoking as a means of promoting the sale of Winston cigarettes.

Lintas: Paris used Noonan's picture to create a full page print advertisement touting The Winston Way. A thought balloon has Noonan's horse contemplating the spectacle that would result if it bucked Noonan off its back. The words "The Winston Way" appear in the ad in English, in the same color and style as the Winston cigarette packaging logo. There is also text in French explaining how to access Le Minitel. The ad was aimed exclusively at French consumers, but some three hundred copies of French magazines containing the ad were circulated in Massachusetts by distributors of foreign language publications. Additionally, a few Massachusetts residents saw the ad while travelling in France during the summer of 1992.

Several Massachusetts residents brought the ad to Noonan's attention. Acquaintances confronted Noonan and demanded to know whether he had "sold out" to the tobacco lords. At least one concerned citizen wrote Noonan an angry letter accusing him of exploiting his uniform to profit personally from the sale of cigarettes. Although no disciplinary action was taken against Noonan by the Boston Police Department, the association of his image with the promotion and sale of cigarettes caused him profound distress.

Noonan filed this suit on May 26, 1994. On August 10 and September 7, 1994, the defendants filed motions to dismiss for lack of personal jurisdiction. On February 3,

operate as one unit on behalf of clients interested in worldwide representation. "Winston" is listed as a Lintas: Worldwide client. See Plaintiff's

exhibit Q. Lintas, Inc., a Delaware corporation with its principal place of business in New York,

1995, Noonan filed a motion to amend the Complaint.[7]

## LEGAL STANDARDS

 When considering a motion to dismiss, the court accepts the facts alleged in the Complaint as true and views any reasonable inference implicit in the pleadings in the light most flattering to the nonmoving party. See *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 16 (1st Cir.1989). However, to make out a prima facie showing of *in personam* jurisdiction, a plaintiff's reliance on the bare allegations of the Complaint is not enough. *Chlebda v. H.E. Fortna & Brother, Inc.*, 609 F.2d at 1024. "The *prima facie* showing of personal jurisdiction must be based on evidence of specific facts set forth in the record. The 'plaintiff must go beyond the pleadings and make affirmative proof.'" *Boit v. Gar–Tec Products, Inc.*, 967 F.2d 671, 675 (1st Cir.1992) (quoting *Chlebda*, 609 F.2d at 1024, citations omitted).

*In personam* jurisdiction takes two forms, general and specific. "General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." *United Elec. Workers v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1088 (1st Cir.1992). "Specific personal jurisdiction, by contrast, is narrower in scope and may only be relied upon 'where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts.'" *Pritzker v. Yari*, 42 F.3d 53, 60 (1st Cir.1994) (quoting *United Elec. Workers*, 960 F.2d at 1088–1089).

 When jurisdiction is grounded in diversity of citizenship, a federal court applies the law of the forum state to resolve disputes. *Gray v. O'Brien*, 777 F.2d 864, 866 (1st Cir.1985). Under Massachusetts law, a plaintiff seeking to establish personal jurisdiction has a twofold burden of demonstrating that the Massachusetts Long Arm Statute, G.L. c. 223A, authorizes jurisdiction over the defendant, and that any such exercise comports with the constraints imposed by the United States Constitution. *Good Hope Industries, Inc. v. Ryder Scott Co.*, 378 Mass. 1, 5–6, 389 N.E.2d 76 (1979). Section 3(a) of the Long Arm Statute asserts specific jurisdiction "over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's ... transacting any business" in Massachusetts. See *Tatro v. Manor Care, Inc.*, 416 Mass. 763, 767, 625 N.E.2d 549 (1994). Section 3(d) of the Long Arm Statute asserts general jurisdiction over a defendant "if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth," and if the defendant by an "act or omission outside this commonwealth" causes tortious injury within the state.

The Massachusetts test of specific jurisdiction, despite the nomenclature it adopts, mirrors the federal analogue. See *Foster–Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 144 n. 3 (1st Cir.1995) (the "transacting any business" and "arising from" elements of section 3(a) of the Long Arm Statute correspond to the federal constitutional requirements of "minimum contacts" and "relatedness"). Moreover, because the Supreme Judicial Court has interpreted the Long Arm Statute as "an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States," *Good Hope*, 378 Mass. at 6, 389 N.E.2d 76 (quoting *"Automatic" Sprinkler Corp. of America v. Seneca Foods Corp.*, 361 Mass. 441, 443, 280 N.E.2d 423 (1972)), jurisdictional disputes in a Massachusetts-based diversity case can often be resolved by reference to federal law.

The standards governing federal constitutional limits of personal jurisdiction are fa-

---

is the U.S. affiliate of Lintas: Worldwide. Lintas, Inc., is not a defendant in this case.

7. Although it is within the discretion of the court to deny a motion to amend that the court determines would be vulnerable to a 12(b)(6) motion, see *Omni–Wave Electronics Corp. v. Marshall Industries*, 127 F.R.D. 644, 646 (D.Mass.1989), I see no reason why the jurisdictional questions surrounding RJR France should not be addressed in the same context as the originally named defendants. Consequently, the motion to amend the Complaint will be allowed.

miliar, if at times bewildering.[8] Historically, a court's jurisdiction over a person was largely dependent upon that person's physical presence in the forum. *Pennoyer v. Neff,* 95 U.S. (5 Otto) 714, 733, 24 L.Ed. 565 (1877). The physical presence requirement gradually eroded until it disappeared altogether in the landmark case of *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In *International Shoe,* the Supreme Court held that "due process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.,* at 316, 66 S.Ct. at 158 (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)). *International Shoe* and its progeny recognize that while modern transportation and telecommunications facilities have necessitated a more expansive view of jurisdiction, they have also lightened considerably the burden of mounting a defense in a foreign forum. The Court nonetheless has cautioned that

> it is a mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of state courts. Those restrictions are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States.... [I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

*Hanson v. Denckla,* 357 U.S. 235, 251–253, 78 S.Ct. 1228, 1238–1240, 2 L.Ed.2d 1283 (1958).

Thus, a finding of personal jurisdiction will not offend due process when "the contacts proximately result from actions by the defendant *himself* that create a substantial connection with the forum State.... [The] 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985) (internal quotation marks and citations omitted, emphasis in original). In other words, a party not physically present cannot be said to fall within a forum state's personal jurisdiction unless his "connection with the forum State [is] such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

The First Circuit has condensed the principles underlying specific jurisdiction into three analytical components:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

*United Elec. Workers,* 960 F.2d at 1089. The "Gestalt factors" (first delineated in *Burger King,* 471 U.S. at 476–477, 105 S.Ct. at 2184–2185, but not labeled as such in this Circuit until Judge Selya's opinion in *Donatelli v. National Hockey League,* 893 F.2d 459, 465 (1st Cir.1990)), are identified by the First Circuit as follows: "(1) the defendant's burden of appearing [in the forum], (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies." *United Elec. Workers,* 960 F.2d at 1088.

---

**8.** In *Hugel v. McNell,* 886 F.2d 1, 3 (1st Cir. 1989), Judge Brown acknowledged that "[p]ersonal jurisdiction, and specifically the constitutionality of State application of long arm statutes, is a topic which over the years has puzzled first year law students and learned jurists alike."

Despite the abundance of legal standards, whether a court possesses *in personam* jurisdiction over a party is, at bottom, largely decided by the specific facts of each case. See *United Elec. Workers,* 960 F.2d at 1089; *Great Western United Corp. v. Kidwell,* 577 F.2d 1256, 1267 (5th Cir.1978); *Good Hope Industries,* 378 Mass. at 2, 389 N.E.2d 76. See also *Pritzker v. Yari,* 42 F.3d at 60 ("[t]he inquiry into minimum contacts is ... highly idiosyncratic, involving an individualized assessment and factual analysis of the precise mix of contacts that characterize each case").

## DISCUSSION

For purposes of discussion, I have divided the defendants into two groups: (1) the "overseas" defendants—CLB; Lintas: Paris; Lintas: Worldwide; and RJR France; and (2) the "American" defendants—RJRTC; RJRTI; and WBI.

1. *The Prima Facie Case against the Overseas Defendants*

■ Given the absence of any contacts between the overseas defendants (with the exception of CLB) and Massachusetts, Noonan acknowledges that the Amended Complaint fails the "foreseeability" test set out by *World–Wide Volkswagen,* supra, and *Asahi Metal Industry Co., Ltd. v. Superior Court of California,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Plaintiff's Opposition Memorandum, at 23–24.[9] Noonan seeks to distinguish these cases, however, arguing that their foreseeability test applies only to products liability claims, and not to intentional torts like defamation, which according to Noonan are governed by an assessment of the "effects" of the tort in the forum state. Noonan cites *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), and *Hugel v. McNell,* 886 F.2d 1 (1st Cir.1989), as cases supporting this proposition, arguing that since he has felt the impact of the ad in Massachusetts, the case should be allowed to proceed against all of the overseas defendants.

9. Noonan's argument is not that he has met his prima facie burden of proving jurisdiction, but

In *Calder,* an actress who lived and worked in California brought suit in a California court against the author and editor of a National Enquirer article which allegedly defamed her. The author and editor were Florida residents who had not travelled to California in connection with the story (although the author had made frequent trips to California to gather similar stories). The article claimed, among other things, that the plaintiff's heavy drinking impaired her ability to fulfill her professional obligations. Noting that the National Enquirer sold over 600,000 copies in California in an average week, the Supreme Court held:

> [The defendants'] intentional, and allegedly tortious, actions were expressly aimed at California. [They authored and edited] an article that they knew would have a potentially devastating impact upon [the plaintiff]. And *they knew that the brunt of that injury would be felt by [the plaintiff] in the state in which she lives and works* and in which the National Enquirer has its largest circulation.

*Calder,* 465 U.S. at 789–790, 104 S.Ct. at 1486–1488 (emphasis added).

In *Hugel,* the McNells were former business associates of then CIA Deputy Director of Operations Hugel, with whom they were embroiled in a bitter financial dispute. The McNells gave two Washington Post reporters information purportedly implicating Hugel in illegal securities transactions. The Post published a front page article under the headline "CIA Spymaster Accused of Improper Stock Practices." The article was widely disseminated by the national news media, eventually forcing Hugel's resignation. Hugel, a New Hampshire resident, sued the McNells in New Hampshire for defamation. After a default judgment entered against the McNells, they appealed on grounds that personal jurisdiction was lacking. The First Circuit found otherwise.

> [W]e conclude that the allegations in Hugel's [complaint] are sufficient to enable the District Court of New Hampshire to assert in personam jurisdiction against the nonresident McNells. *The complaint suf-*

that he should be permitted an opportunity to make the required showing by way of discovery.

*ficiently alleges that the McNells actually directed their actions at a New Hampshire resident.* The McNells knew that release of the allegedly false information would have a devastating impact on Hugel, and it can be fairly inferred *that they intended the brunt of the injury to be felt in New Hampshire where Hugel had an established reputation* as a businessman and public servant.

*Hugel,* 886 F.2d at 4–5 (emphasis added).

■ While *Hugel* and *Calder* can be fairly read to add an "effects" test to the jurisdictional mix in defamation cases, they also make clear that a defamatory "effect" by itself is not sufficient to confer jurisdiction over a foreign defendant. Rather, to make a prima facie showing, the victim of the defamatory statement must demonstrate that its author *intended* the libel to be felt in the forum state. This intentionality requirement flows directly from the purposeful availment dictate of *Burger King,* 471 U.S. at 475, 105 S.Ct. at 2184.

■ Noonan does not allege that any of the defendants (overseas or American) even knew who he was, much less that they published his picture intending that he be harmed in Massachusetts. There may be some truth to Noonan's assertion that "tobacco products in recent years are seen [by Americans] as [such] 'disfavored products'" that his involuntary appearance in a cigarette ad constitutes a defamatory occurrence. The serendipitous third party distribution of three hundred French language magazines containing the ad does not, however, constitute such a "purposeful availment" of the benefits and protections of the laws of Massachusetts that Lintas: Paris, Lintas: Worldwide, or RJR France should have anticipated the possibility of being involuntarily haled into its courts as a result.[10]

10. Obviously, neither RJR France nor Lintas "caused" the magazines to be distributed in Massachusetts. I will assume, however, that in this global age, the foreseeable consequences of placing an ad in a general interest magazine in France might arguably include its distribution in Massachusetts by third parties.

11. There is no suggestion that CLB's contacts with Massachusetts are so pervasive as to permit a claim of general jurisdiction.

■ The factual allegations against CLB are of more substance. The activities attributed to CLB's employees and agents, if documented, are sufficient to satisfy Massachusetts' transacting business test. See *Tatro,* 416 Mass. at 767–768, 625 N.E.2d 549. (I recognize that the allegations are disputed in varying degrees by CLB). CLB's claim to have "owned" the Noonan photo might also permit a reasonable inference that the photographer who took the picture was acting as an agent of CLB.[11]

### 2. The Prima Facia Case Against The American Defendants

■ Noonan argues that M.G.L. c. 223A, §§ 3(c) and 3(d) authorize jurisdiction over the American defendants, RJRTC, RJRTI, and WBI. While the Massachusetts Long Arm Statute is an assertion of jurisdiction to the limits allowed by the United States Constitution,

> G.L. c. 223A, § 3, asserts jurisdiction over the person to the constitutional limit only when some basis for jurisdiction enumerated in the statute has been established. Although presented with jurisdictional facts sufficient to survive due process scrutiny, a judge would be required to decline to exercise jurisdiction if the plaintiff was unable to satisfy at least one of the statutory prerequisites.

*Good Hope Industries, Inc.,* 378 Mass. at 6, 389 N.E.2d 76.[12] Section 3(c) authorizes specific jurisdiction when a claim arises from a defendant's "causing tortious injury by an act or omission in this commonwealth." Similarly, section 3(d) asserts general jurisdiction where a defendant otherwise engaged with the forum commits an act outside the Commonwealth that causes a tortious injury with-

12. Where a plaintiff is clearly unable to establish jurisdiction as a matter of state law, it is the better practice to end the inquiry without addressing constitutional concerns. See *Ticketmaster—New York, Inc. v. Alioto,* 26 F.3d 201, 205 (1st Cir.1994).

in its territory.[13] While Noonan sufficiently pleads that he has suffered a tortious injury in Massachusetts, he is unable to connect this harm to any "act" attributable to the American defendants.[14]

In addressing section 3(a) of the Long Arm Statute, the First Circuit has cautioned that "[a]lthough the 'transacting of any business' clause should be construed broadly 'and applies to any purposeful acts by an individual, whether personal, private, or commercial,' the exercise of jurisdiction under the Massachusetts long-arm statute will nonetheless fail if the cause of action did not *arise from* defendant's transaction of business in Massachusetts." *Gray v. O'Brien*, 777 F.2d at 867 (emphasis added, internal citations omitted). In similar fashion, section 3(c) requires a well-pleaded allegation that a defendant did some act *in* the Commonwealth that caused the plaintiff harm. While section 3(d) asserts general jurisdiction over defendants (like RJRTC) who have extensive unrelated contacts with Massachusetts, the plaintiff must still specify some act committed by the defendant outside the forum that relates to the in-state cause of action.

Because the allegations in the Amended Complaint relate to neither the in-state nor the extra-forum activities of any of the American defendants, jurisdiction under the Long Arm Statute does not lie directly. Moreover, as no prima facie showing of jurisdiction has been made against any of the overseas "tobacco defendants," jurisdiction cannot be found on a theory of derivative liability, whatever the corporate relationship that exists between or among these and the American defendants. Cf. *Wilson v. Holiday Inn*

*Curacao N.V.*, 322 F.Supp. 1052, 1054 (D.Mass.1971).

### 3. *Plaintiffs' Request for Discovery*

This aspect of the case implicates two distinct legal principles which despite their general application, often collide in an *in personam* jurisdiction dispute. The first is the right accorded to a putative defendant to seek relief from the burdens of discovery by way of a motion to dismiss. Because in this context the plaintiff's well pleaded facts are ordinarily accepted as true, there is a usually correct assumption that discovery will not aid the court in evaluating the legal sufficiency of the complaint. The second principle is that a court has jurisdiction to determine its own jurisdiction, and the corollary that when discovery will aid the making of a jurisdictional ruling, an order tailored to that end is properly within the jurisdiction of the court. Tension between these two legal doctrines arises when, in a contest over personal jurisdiction, a plaintiff cannot simply rely on the averments of the complaint, but is put to a factual test of his jurisdictional claim.[15] See *Chlebda*, 609 F.2d at 1024.

At the court's request, the parties submitted additional briefs addressing the district court's power to order discovery in instances where a plaintiff is unable to make a prima facie showing of personal jurisdiction. In his supplemental memorandum, Noonan draws attention to the principle that "[t]he requirement that a court have personal jurisdiction flows not from Art. III, but from the Due Process Clause [of the Constitution].... It represents a restriction on judicial power not as a matter of sovereignty, but

**13.** For purposes of this motion, I assume that RJRTI's and WBI's global marketing efforts give rise to a claim of general jurisdiction in Massachusetts.

**14.** The Amended Complaint alleges in passing that the Lintas: Paris campaign was undertaken "on behalf and with the approval of the RJ Reynolds defendants [The Winston Company, RJR France, RJRTC, RJRTI, and WBI]." Amended Complaint ¶ 34. There are no facts alleged in the Complaint to support this allegation.

**15.** A further complication is presented by the flexible approach to jurisdictional analysis sanc-

tioned in this Circuit by *Boit v. Gar–Tec Products, Inc.*, 967 F.2d 671, an approach somewhat impeded by "the inconvenience of mild doctrinal uncertainty." *Foster–Miller*, 46 F.3d at 148. Compare *United Elec. Workers v. 163 Pleasant Street Corp.*, 960 F.2d 1080 (1st Cir.1992) (reversing district court's entry of preliminary injunction on grounds that personal jurisdiction was wanting over the defendant) with *United Elec. Workers v. 163 Pleasant Street Corp.*, 987 F.2d 39 (1st Cir.1993) (vacating district court's order of dismissal for want of personal jurisdiction upon appellate court's finding that a prima facie case of jurisdiction had in fact been made).

as a matter of individual liberty." *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982). This liberty interest, the *Bauxites* Court reasoned, may be waived. *Id.* at 703, 102 S.Ct. at 2105. Thus, when a defendant enters an appearance to contest a claim of personal jurisdiction, the defendant waives its right to be free of the court's jurisdiction, at least for purposes of the jurisdictional determination itself. The *Bauxites* holding, as Noonan portrays it, compels discovery in almost any case in which a plaintiff is unable to make a prima facie showing of jurisdiction. In his Opposition Memorandum, at 18–19, Noonan argues:

> The reasonableness of the approach proposed by the plaintiffs is reflected by the First Circuit ... decision in *General Contracting & Trading Co., LLC v. Interpole, Inc.,* 899 F.2d 109 (1st Cir.1990), which held that the failure of the trial court to give a party requesting an evidentiary hearing on a jurisdictional question a hearing constituted reversible error.... [T]he trial court on remand [was required] to allow "a brief period of discovery devoted exclusively to the jurisdictional issue and hold a hearing to determine the matter."

This much is clear. Were a court without power to order discovery until *after* a finding of jurisdiction, at least two of the evidentiary methods of settling disputes over jurisdiction authorized by *Boit* (evidentiary hearings applying a preponderance-of-the-evidence or a less rigorous "intermediate" standard) would be superfluous. These *Boit* methods clearly anticipate that some discovery will be conducted *prior* to the court's determination of the jurisdictional question. Moreover, if disputes arise during that discovery period, or if the defendant engages in improper conduct or disregards a discovery order, the defendant may be sanctioned for its misconduct, *even if the court ultimately resolves the jurisdictional issue in its favor.* That is the real import of the holding in *Bauxites.*

Noonan's argument that a plaintiff who fails to make a prima facie showing of jurisdiction is *entitled* to discovery is not supported by the cases he cites. Although Noonan correctly points out that "in one of the cases primarily relied on by defendants in support of the present motions, *Boit v. Gar-Tec Products,* ... the party opposing a motion to dismiss for lack of *in personam* jurisdiction obtained deposition testimony relevant to the jurisdictional inquiry," Opposition Memorandum, at 19, *Boit* stops well short of creating an entitlement in this regard.

In *Boit,* Judge Keeton explained that a court might decide to conduct an evidentiary hearing where fundamental fairness appears to require that a plaintiff be held to a *higher* standard of proving jurisdiction than the presumptive prima facie showing.

> A court may determine that in the circumstances of a particular case it is unfair to force an out-of-state defendant to incur the expense and burden of a trial on the merits in the local forum without first requiring more of the plaintiff than a *prima facie* showing of facts essential to *in personam jurisdiction.* A court may so determine, for example, when the proffered evidence is conflicting and the record is rife with contradictions.... In these circumstances, the court may 'hear[ ] and determine[ ] [the motion to dismiss] before trial,' Fed.R.Civ.P. 12(d), considering all relevant evidence proffered by the parties and making all factual findings essential to disposition of the motion.

*Boit,* 967 F.2d at 676. Judge Keeton strongly implied that the evidentiary hearing is intended for the benefit of the party resisting jurisdiction, since it is that party which bears the burden of defending itself in a foreign court. For example, a second case Noonan cites, *General Contracting & Trading Co., LLC v. Interpole, Inc.* 899 F.2d 109 (1st Cir.1990), is one in which the *defendant* requested an opportunity to cross-examine the plaintiff's affiant upon whose averments the district court had based its prima facie finding of personal jurisdiction. In *General Contracting,* after the district court refused to grant such a hearing, the First Circuit reversed.

> In the face of a preserved jurisdictional defense, a timeous, twice-repeated hearing request, and a conflicted set of facts, we think the court below erred in refusing to take evidence....

In sum, we do not believe that [the defendant] had a sufficient opportunity to counter the jurisdictional 'facts' posited by [the plaintiff] or to present the complete picture to the district court. . . . Given, especially, the fundamental relationship of the jurisdictional inquiry to the judicial task and the conflicted versions of the relevant facts, it was an abuse of discretion not to grant [defendant's] request for an evidentiary hearing or at least to establish some sort of alternate factfinding procedure.

899 F.2d at 115.

The last of the three cases relied upon by Noonan, *Borschow Hospital & Medical Supplies Inc. v. Burdick–Siemens Corp.*, 143 F.R.D. 472 (D.P.R.1992) (*Borschow II* ), is miscited. (Noonan refers to the case as "Borgia"). Noonan is simply wrong in his factual conclusion that

the *Borgia* [sic] court permitted discovery on jurisdiction and observed that such discovery was likely to involve further investigation of the corporate structure and decision-making process of the foreign corporation defendants by means of deposition of company officials.

Opposition Memorandum, at 21. In fact, the *Borschow II* court found that documentary evidence submitted by the parties supported a finding of jurisdiction before any discovery was ordered in the case. *Borschow II*, 143 F.R.D. at 483, 484. See also *Borschow Hospital & Medical Supplies Inc. v. Burdick–Siemens Corp.*, 143 F.R.D. 468, 471 (D.P.R. 1992) (*Borschow I* ). In *Borschow I*, District Judge Perez–Gimenez declined to accept the Report and Recommendation of a Magistrate Judge that the case be dismissed for lack of personal jurisdiction. The Magistrate Judge had relied heavily on an affidavit submitted by one of the defendants describing its corporate structure and affiliations. Judge Perez–Gimenez found that same affidavit to be inconsistent with other evidence in the record, and on his own motion, ordered the defendant to submit further support for its claims. *Borschow I*, 143 F.R.D. at 471. The defendant withdrew the earlier filed affidavit and presented the court with "[a]n undocumented summary purporting to establish the relation between [it and the other] defen-

dants." *Borschow II,* 143 F.R.D. at 476. In light of the defendant's inability to reconcile its inconsistent representations to the court, and based on other documentary evidence entered into the record, the district court determined, "*before* any discovery [wa]s undertaken by the parties," *id.* at 483 (emphasis added), that it had personal jurisdiction over the defendants because they had engaged in the requisite minimum contacts and had purposefully availed themselves of the forum. *Borschow II,* 143 F.R.D. at 483, 485. Noonan's citation to page 485 of the *Borschow II* opinion, where the court predicted that the plaintiff would conduct extensive discovery on the issue of the defendant's international corporate structure, was not offered as support for an entitlement on the plaintiff's part to conduct jurisdictional discovery, but as one of the Gestalt factors weighing *against* compelling the defendant's participation.

Finally, the Court turns to the hopscotch Gestalt factors first enunciated by the Supreme Court in *Burger King Corp. v. Rudzewicz* . . . . There is no denying that Siemens' burden of appearing is substantial if for no other reason that discovery is likely to involve further investigation of the corporate structure and decision making process of foreign corporations by means of deposition of company officials. But mere inconvenience or geographical distance does not suffice to defeat jurisdiction *if it is otherwise proper.*

*Borschow II,* 143 F.R.D. at 485 (emphasis added).

Noonan finds more solid ground for his request for discovery in *Surpitski v. Hughes–Keenan Corp.,* 362 F.2d 254, 255 (1st Cir.1966).

[A] plaintiff who is a total stranger to a corporation should not be required, unless he has been undiligent, to try [the question of personal jurisdiction] on affidavits without the benefit of full discovery. If the court did not choose to hear witnesses, this may well have been within its province, but in such event plaintiff was certainly entitled to file such further interrogatories as were reasonably necessary and, if he wished, to take deposition

Assuming *Surpitski*'s modern viability,[16] the case mandates pre-jurisdictional discovery only where a plaintiff is able to identify the specific facts which he seeks to round out his prima facie case. Cf. *Surpitski*, 362 F.2d at 255–256 ("[T]he [district court's] condemnation of plaintiff's proposed further activities as a 'fishing expedition' was unwarranted. When the fish is identified, and the question is whether it is in the pond, we know no reason to deny a plaintiff the customary license").

The territory that Noonan proposes to explore is the legal interrelationship of the "tobacco defendants." Noonan argues that the complexities of these defendants' multinational ties requires that he be allowed to search out facts to enable the court to "make an actual inquiry into the nature of the interrelationship [of the corporate entities] before abandoning the jurisdictional quest." *Donatelli*, 893 F.2d at 465.

> In general, the courts have presumed the institutional independence of parent and subsidiary when determining whether jurisdiction may be asserted over the parent solely on the basis of the subsidiary's contacts with the forum. But, the fact of separate incorporation is not alone determinative of a court's constitutional power to assert personal jurisdiction over the parent based on the subsidiary's activities; rather, "there is a presumption of corporate separateness that [may] be overcome by clear evidence."

*Donatelli*, 893 F.2d at 465 (quoting *Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902, 905 (1st Cir.1980)) (citations omitted). The problem is that none of this ferreting would be of any assistance to Noonan's case. Assuming that Noonan can establish the requisite degree of domination by the American defendants over their overseas affiliates (such as that exerted by a principal over an agent or an "exercise of control by the parent [over the subsidiary that is] 'greater than that normally associated with common ownership and directorship,'" *Donatelli*, 893 F.2d at 466), that result would trigger personal jurisdiction over the parent only if the offending subsidiary were subject to the jurisdiction of the court. Since Noonan has failed to demonstrate that the court has jurisdiction over any of the American defendants' overseas affiliates, the quest Noonan proposes would be futile.[17]

## CONCLUSION

For the foregoing reasons, the plaintiffs' motion for leave to file an Amended Complaint is *ALLOWED*. The defendants' motion to dismiss the Complaint will be treated as a motion to dismiss the Amended Complaint and is *ALLOWED* without prejudice as to defendants RJRTC, RJRTI, Lintas: Worldwide, Lintas: Paris, and WBI.[18] The motion to dismiss as to CLB is *DENIED*. Plaintiff will be granted a 120 day period of discovery to bolster his jurisdictional claims against CLB. The Clerk will schedule a conference to set the parameters of that discovery. The court takes no position on the issue of whether further discovery taken against CLB might not entitle Noonan to reinstitute suit against any of the dismissed defendants or to seek additional discovery

---

**16.** More recent cases have been much less generous on this point. In *Market/Media Research, Inc. v. Union Tribune Publishing Co.*, 951 F.2d 102, 106 (6th Cir.1991), for example, the plaintiff's action was dismissed over its objection that it was entitled to a period of jurisdictional discovery to make out a prima facie case. The *Union Tribune* court affirmed the dismissal, explaining that while granting discovery to the plaintiff may be required in cases where the court seeks to dismiss a claim based upon a factual determination, those cases involving a higher standard of proof "should not be read to require the district court to hold an evidentiary hearing [nor, by implication, to allow discovery to take place] when, as in the instant case, a plaintiff's pleadings and affidavits are insufficient to make a prima facie showing of facts supporting the court's assertion of *in personam* jurisdiction." Id. at 106.

**17.** Although general jurisdiction may exist over RJRTC, jurisdiction over the parent corporation does not create jurisdiction over that parent corporation's subsidiaries. Like respondeat superior, "vicarious jurisdiction" is a one way street; liability flows up the corporate ladder, it does not flow down.

**18.** "The Winston Company" is apparently a nonexistent entity. If it does exist, it has not been served and thus is not a party to this lawsuit.

against other defendants, named or un-named.

SO ORDERED.