Kennett v. Business and Taxpayers     CV-94-481-M    03/26/96
UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Douglas Kennett,
     Plaintiff,

     v.                                    Civil No. 94-481-M

Business and Taxpayers Coalition
for Affordable Housing; Billy Hardin;
Billy Hardin d/b/a Winston Financial
Group and d/b/a Southwestern Affordable
Housing Company; and Harry Nagler,
     Defendants.


                          O R D E R


     The plaintiff, Douglas Kennett, brings this action for libel

and contractual interference against the defendants, Business and

Taxpayers Coalition for Affordable Housing ("BTCAH"), Billy

Hardin, and Harry Nagler.  All defendants move to dismiss

(documents no. 22 and 23) Kennett's claims for lack of personal

jurisdiction, Fed. R. Civ. P. 12(b)(2), and improper venue, Fed.

R. Civ. P. 12(b)(3).


                      **Standard of Review**

     When considering a motion to dismiss for lack of personal

jurisdiction without an evidentiary hearing, the court applies

the prima facie standard of review.  Sawtelle v. Farrell, 70 F.3d

1381, 1386 n.1 (1st Cir. 1995).  The court "draws the facts from

the pleadings and the parties' supplemental filings, including

affidavits, taking facts affirmatively alleged by the plaintiff as true and viewing disputed facts in the light most favorable to plaintiff."  Id. at 1385 (citing Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994); Kowalski v. Doherty, Wallace, Pillsbury and Murphy, Attorneys at Law, 787 F.2d 7, 9 (1st Cir. 1986)).  However, conclusory allegations are not credited, nor will the court draw "far-fetched inferences" in favor of the plaintiff.  Sawtelle, 70 F.3d at 1386 (citing Ticketmaster, 26 F.3d at 203).  "In reviewing the record before it, a court 'may consider pleadings, affidavits, and other evidentiary materials without converting the motion to dismiss to a motion for summary judgment.'"  Price, 781 F. Supp. at 87 (quoting Lex Computer & Management Corp. v. Eslinger & Pelton, P.C., 676 F. Supp. 399, 402 (D.N.H. 1987)).

## Background

The present dispute stems from a soured business relationship between Kennett and the defendants.  From 1990 to 1993, Kennett raised over $9,000,000 from residential real estate investors who sought to receive low income housing investment tax credits and investment income.  A group of these investors is known as American Housing Funds.  BTCAH, whose managing partner and officer was Billy Hardin, is a non-profit California corporation formed to rehabilitate low-income housing and which

2

owns and manages several apartment complexes in Texas. BTCAH is also a general partner in several limited partnerships with American Housing Funds, in which it managed Texas real estate investments for American Housing Funds.

The relationship between Kennett and the defendants took a turn for the worse in 1994 when Kennett, as general partner of American Housing Funds, sued BTCAH in Texas claiming, inter alia, breach of contract, deceptive trade practices, and fraudulent conversion of funds. Kennett demanded the return of $345,000 and to have control of residential investment properties managed by BTCAH placed in the hands of a receiver. BTCAH agreed to pay the requested amount and to turn over to a receiver two Texas properties (Lake Bluff and Burnett Place) within forty-eight hours. Then, BTCAH filed for Chapter 11 bankruptcy protection in California. On March 3, 1994, the bankruptcy petition operated to automatically stay the Texas litigation. On August 24, 1994, the Federal Bankruptcy Court in Los Angeles dismissed BTCAH from bankruptcy and released the properties. BTCAH now allegedly controls the assets it agreed to turn over to a receiver.

In this suit, Kennett maintains that Billy Hardin, on behalf of BTCAH, and as agent of Harry Nagler at all relevant times, published and disseminated letters which defamed Kennett, injuring his reputation among American Housing Funds investors and the general public. Kennett further alleges that Nagler was

3

complicit in the authorship, publication, and dissemination of Hardin's defamatory letters.  Plaintiff also claims that Nagler personally authored and disseminated two defamatory letters.  All of the letters in question generally portray Kennett as a dishonest businessman who has lied to and stolen money from his investors.

According to Kennett, Hardin's letter of April 29, 1994, was disseminated to the "general public, including investors throughout the state of New Hampshire."  Other letters signed by Billy Hardin (May 18, 1994; June 9, 1994; and June 16, 1994) were sent to "the general public, including individuals and specific investors in American Housing Funds."

Harry Nagler allegedly assisted Hardin in the drafting and dissemination of the April 29, 1994, letter.  Plaintiff claims that Nagler also authored and disseminated two letters  (April 22, 1994 and May 22, 1994) to the general public and investors outside of New Hampshire.

The defamatory letters, claims Kennett, were directed at him in New Hampshire and caused injury to his business reputation here.  Kennett says investors are no longer willing to participate in his real estate, movie and "high-tech" video ventures as a direct result of the false and defamatory information communicated in the letters sent by the defendants.  Kennett maintains that the defendants knew the letters would

4

expose him to contempt and ridicule and would have the desired effect of undermining his business.

Kennett claims to have been a New Hampshire domiciliary and resident of this state during all relevant periods.[1] Nagler and Hardin are Texas residents. BTCAH is a California corporation registered as doing business in Texas. None of the defendants conducts business in New Hampshire.

## Discussion

### I. New Hampshire Long-Arm Statute

As the plaintiff, Kennett must first establish that the non-resident defendants are subject to personal jurisdiction under New Hampshire's long-arm statute, N. H. Rev. Stat. Ann. ("RSA") § 510:4(I). See, e.g., Hugel v. McNell, 886 F.2d 1, 3 (1st Cir. 1989), cert. denied, 494 U.S. 1079 (1990); Kowalski v. Doherty, Wallace, Pillsbury and Murphy, 787 F.2d 7, 10 (1st Cir. 1986). RSA 510:4(I) provides in pertinent part that "[a]ny person who is not an inhabitant of this state and who, in person or through an agent . . . commits a tortious act within this state . . . submits himself . . . to the jurisdiction of the courts of this

_____

[1] Answering Hardin and BTCAH's interrogatories, Kennett stated that in 1993 and 1994 he was physically present in New Hampshire "99.9%" of the time. He also stated that he was filming a movie entitled "Iron Man" in North Conway, N.H., from July through October, 1993. (See Answers to Defendant's Interrogatories ¶¶ 18, 19, attached to document no. 23).

5

state as to any cause of action arising from or growing out of the acts enumerated above." Id. The New Hampshire Supreme Court has interpreted this statute as authorizing the assertion of personal jurisdiction over non-resident tortfeasors to the full extent allowed by the Due Process Clause of the Constitution. Phelps v. Kingston, 130 N.H. 166, 171 (1987). The Court of Appeals for the First Circuit recently held that "when a state's long-arm statute is coextensive with the outer limits of due process, the court's attention properly turns to the issue of whether the exercise of personal jurisdiction comports with federal constitutional standards." Sawtelle v. Farrell, 70 F.3d 1381, 1388 (1st Cir. 1995) (citing Phelps, 130 N.H. at 171)). Thus, in this case the constitutional inquiry will determine whether the exercise of personal jurisdiction over defendants is proper.

## II. The Due Process Clause

In determining whether specific personal jurisdiction exists over a nonresident defendant, "[t]he Fourteenth Amendment's concern of fundamental fairness is achieved by the central requirement that certain 'minimum contacts' exist between the defendant and the forum state." Sawtelle, 70 F.3d at 1388 (citing International Shoe Co. v. State of Washington, 326 U.S. 310, 316 (1945); Ticketmaster, 26 F.3d at 206). Crucial then to

6

the court's assertion of jurisdiction is the quality and nature of the defendant's contacts with the forum state in connection with the causes of action alleged in the complaint. Helicopteros Nacionales de Colombia, South America v. Hall, 466 U.S. 408, 413-414 (1984) (citing Shaffer v. Heitner, 433 U.S. 186, 204 (1977)).

A three-part test is employed in this circuit to determine whether contacts are sufficient to support the exercise of personal jurisdiction:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

Sawtelle, 70 F.3d at 1389 (citations omitted). "Central to each step of the established analysis, therefore, are the contacts which are attributable to each defendant in this case." Id. As to all defendants, the contacts at issue are defamatory letters which can be categorized in two groups: (1) the in-state letter, and (2) out-of-state letters. Each communication of a defamatory statement by the same defamer is a separate publication, and each

7

publication gives rise to a separate cause of action.  See Restatement (Second) of Torts § 577A(1) & comment a (1977).

Accordingly, the court will consider whether each category of letters attributable to each defendant satisfies each prong of the tripartite specific jurisdiction inquiry.

**A.    The Relatedness Factor as to All Defendants and All Letters**

To satisfy this first prong of the due process inquiry, "the action must directly arise out of the specific contacts between the defendant and the forum state." 70 F.3d at 1389 (citations omitted).  Hardin, in collaboration with Nagler and on behalf of BTCAH, is alleged to have authored and disseminated a defamatory letter dated April 29, 1994, throughout New Hampshire, to the general public, and to investors in American Housing Funds. Hardin and Nagler authored and disseminated other letters to investors and the general public outside of New Hampshire.

Plaintiff specifically alleges the following with respect to all letters: (1) he had previously raised over $9,000,000 from investors in American Housing Funds (complaint ¶ 11); (2) those investors were to be included in future business deals, including real estate, movie and video ventures (complaint ¶ 27); (3) the defendants mailed defamatory letters to the investors and the general public (complaint ¶¶ 21-24); and (4) as a result of the

8

defamatory statements in the letters, American Housing Funds investors are now unwilling to invest in his projects (complaint ¶ 27). Plaintiff also alleges throughout the complaint that all defamatory statements were directed at him in New Hampshire and that the defendants knew the letters would injure him in his vocation, and intended that result.

The in-state letter certainly constitutes a contact with New Hampshire. See Sawtelle, 70 F.3d 1381, 1389-90 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985)). The letters disseminated outside of this state also constitute contacts with New Hampshire because the plaintiff has sufficiently alleged, and evidence in the record supports, that the defendants knew plaintiff would suffer harm in New Hampshire, where he works and resides, as a result of the publication directed at this state. See Price, 781 F. Supp. at 92 (citing Hugel v. McNell, 886 F.2d 1, 4 (1st Cir. 1991) (citing Calder v. Jones, 465 U.S. 783, 789 (1984))). For example, the record contains a letter signed by Hardin, dated April 29, 1994, and addressed to a California resident. (attached to document no. 2). The letter is on BTCAH letterhead and Hardin wrote the letter in his position as BTCAH's Director of Operations. In part, the letter states:

> Douglas Kennett has used your funds to make a
> motion picture written, directed, produced
> and starring himself as the "Iron Man."
> Meanwhile, he left Dallas nearly a year ago

9

> to his refuge in the White Mountains of New
> Hampshire . . . . After Kennett fled Dallas
> for the hills of New Hampshire . . . .

(letter at ¶¶ 4, 8).

Nagler, in an affidavit, also indicates his knowledge of the plaintiff's presence in New Hampshire. (attached to document no. 22). As of January 7, 1994, Nagler knew that plaintiff worked for a company that relocated to New Hampshire. (Affidavit at ¶ 13). On March 4, 1994, Nagler knew that plaintiff opened a New Hampshire office for American Housing Funds and he was given a New Hampshire phone number to be used for future inquiries. (Affidavit at ¶ 14). On January 10, 1994, Nagler received an "American Housing Update" bulletin which informed him that plaintiff had not been in Texas since 1993 and was involved in making a movie in New Hampshire. (Affidavit at ¶ 18). In April, 1994, Nagler saw an article in a Connecticut newspaper which stated that plaintiff had moved from Texas to New England to make his first movie. (Affidavit at ¶ 15). Therefore, by his own admissions, Nagler knew or should have known that any injury resulting from his out-of-state conduct would be felt foremost by plaintiff in New Hampshire.

Out-of-state tortious conduct directed at New Hampshire, combined with the tortfeasor's knowledge that the "major impact" of that conduct will be felt within this state, is a substantial

10

contact with the forum for purposes of asserting personal jurisdiction.  See Price, 781 F. Supp. at 92 (citing Hugel v. McNell, 886 F.2d 1, 4 (1st Cir. 1991) (citing Calder v. Jones, 465 U.S. 783, 789 (1984))); see also First American First, Inc. v. National Association of Bank Women, 802 F.2d 1511, 1517 (4th Cir. 1986); Burt v. Board of Regents of University of Nebraska, 757 F.2d 242, 244-245 (10th Cir. 1985); Concord Labs, Inc. v. Ballard Medical Products, 701 F. Supp. 272, 276 (D.N.H. 1988); Lex Computer & Management v. Eslinger & Pelton, P.C., 676 F. Supp. 399, 404-405 (D.N.H. 1987).  The dissemination of defamatory letters to investors in New Hampshire and elsewhere, designed to discourage future business relationships with a New Hampshire resident and businessman, causes injury in New Hampshire.  See generally, Price, 781 F. Supp. at 92; Lex Computer, 676 F. Supp. at 404, 405; Concord Labs, 701 F. Supp. at 276 (all holding that jurisdiction is proper where defamatory letters mailed to out-of-state customers of a New Hampshire business have the effect of harming sales potential).

Defendants' tortious conduct directed at New Hampshire, and the harm felt by plaintiff there, represent the gravamen of the complaint.  Not only do the causes of action against the defendants relate to the letters, but the letters constitute the very foundation of his claims in libel and contractual interference.  Therefore, plaintiff has made a prima facie

11

showing that his claims against all defendants directly arise out of their contacts with New Hampshire.

### B.    Purposeful Availment

The second prong of the jurisdictional analysis asks whether each defendant "purposefully availed" himself of the forum state. The answer differs somewhat depending on whether or not the letters were distributed in New Hampshire. Thus, in-state and out-of-state letters are considered separately to determine if each defendant purposefully availed himself of the benefits and protections of the State of New Hampshire.

Although, by sending defamatory letters to investors and the general public, the defendants may not have "conducted business" in New Hampshire in the common understanding of the phrase, the true "function of the purposeful availment requirement is to assure that personal jurisdiction is not premised solely upon a defendant's 'random, isolated, or fortuitous' contacts with the forum state." Sawtelle, 70 F.3d at 1391 (citing Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1980)). The "cornerstones" of the purposeful availment concept are voluntariness and foreseeability. Sawtelle, 70 F.3d at 1391 (citing Ticketmaster, 26 F.3d at 207). With these general principles in mind, the court will examine the in-state and out-of-state letters in turn.

12

**1. In-State Letter**

**a. Hardin**

In <u>Burger King v. Rudzewicz</u>, the Supreme Court held that letters mailed into a state can constitute sufficient minimum contacts so long as the letters were "purposefully directed" there. 471 U.S. 462, 476; <u>see</u> <u>also</u> <u>Froess v. Bulman</u>, 610 F. Supp. 332, 336-337 (D.R.I. 1984), <u>aff'd</u>, 767 F.2d 905 (1st Cir. 1985) (one letter mailed to plaintiff's employer was a sufficient contact on which to base specific jurisdiction). Crediting as true the allegation that Hardin's April 29th letter was intentionally distributed to American Housing Funds investors throughout New Hampshire, Hardin's contacts cannot be described as random, isolated, or fortuitous and, therefore, constitute purposeful availment.

Further, in <u>Keeton v. Hustler</u>, the Supreme Court held that the regular distribution of magazines in New Hampshire was "unquestionably" a constitutionally valid basis upon which to exercise personal jurisdiction over <u>Hustler</u> because the defendant purposefully directed its conduct at New Hampshire and "inevitably affected people in the state." 465 U.S. at 774. Here, plaintiff alleges that Hardin intentionally sent defamatory letters, knowing harm would result. Thus, based on <u>Burger King</u> and <u>Keeton</u>, plaintiff's allegations are sufficient to establish voluntary and purposeful contacts with this state such that it

13

should have been foreseeable to Hardin that he would be haled into court in this forum to defend his actions.  See also Buckley v. McGraw Hill, Inc., 762 F. Supp. 430, 438-439 (D.N.H. 1991) (defendants "reasonably anticipate being haled into court in a libel action where injury to the targeted plaintiff can be expected to occur" in New Hampshire).

### b.    BTCAH

BTCAH is subject to personal jurisdiction for the torts of its agents acting in the scope of their duties or under the control of BTCAH.  In Sawtelle, this Circuit held that "[u]nder elemental principles of agency," the contacts of two attorneys were attributable to their respective law firms.  See 70 F.3d at 1389 n.4 (citing United Electrical Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1090 (1st. Cir. 1992) (contacts of corporation's agent can subject the corporation to personal jurisdiction); Donatelli v. National Hockey League, 893 F.2d 459, 467 (1st Cir. 1990) (contacts of a partner committed in the furtherance of partnership business are imputed to the partnership)).

The plaintiff contends that Hardin worked for BTCAH as a managing partner until May, 1994, and that Hardin authored and disseminated his letters on behalf of BTCAH.  Evidence in the record supports this.  The Hardin letter of April 29, 1994, was

14

written on BTCAH letterhead and was signed "Billy Hardin, Director of Operations, Business and Taxpayers Coalition for Affordable Housing." After portraying the plaintiff in an unfavorable light, Hardin wrote in the letter, inter alia, that "[t]he Business and Taxpayers Coalition for Affordable Housing and I have a solution." Hardin then set forth the various ways in which he and BTCAH could salvage their investments with Kennett. (See letter attached to document 2). Thus, to the extent that Hardin acted on behalf of BTCAH in the authorship and dissemination of the defamatory letters, BTCAH is subject to personal jurisdiction in New Hampshire.

### c. Nagler

The plaintiff does not allege that any letters actually signed by Nagler were disseminated in New Hampshire. Plaintiff does allege that at all relevant times, with respect to each defamatory letter, the defendants were engaged in principal-agent relationships in the course of which the letters were authored and disseminated. Plaintiff also alleges that each defendant controlled and ratified the actions of the other during the drafting and dissemination of the letters. (complaint ¶ 10).

Elsewhere in the complaint, the plaintiff makes more detailed factual allegations concerning Nagler's involvement in the Hardin letters. (See complaint ¶ 24). Specifically,

15

plaintiff alleges that "Nagler collaborated extensively in the authorship of the Hardin letters of April 29, 1994, [allegedly distributed throughout N.H.], May 18, 1994, June 9, 1994, and June 16, 1994, and collaborated with Hardin in distributing the letters and drafting the materials." Id. Plaintiff's claim of extensive collaboration in the authorship and distribution of the April 29, 1994, letter, construed in a light most favorable to plaintiff, could reasonably be inferred to mean that both defendants authored and distributed the letter, even though only Hardin signed it. Thus, the distribution of the April 29, 1994, letter throughout New Hampshire constitutes a substantial contact with New Hampshire on the part of Nagler as well as Hardin.

## 2. Out-of-State Letters of All Defendants

Next, the court considers whether each defendant's contacts with New Hampshire, by way of the letters disseminated outside of this state, represent a purposeful availment or contact. In Calder v. Jones, 465 U.S. 783 (1984), the Supreme Court considered whether a libelous article, authored in Florida and disseminated in the forum state (California), constituted a purposeful availment. The Court held that jurisdiction over the nonresident defendants who only wrote and edited the article, but had no hand in distributing it within California, could be properly based on the "effects" of their Florida conduct in

16

California.  Id.  Specifically, the Court held that jurisdiction was proper because:

> (i) their intentional actions were aimed at the forum State, (ii) they knew that the article was likely to have a devastating impact on the plaintiff, and (iii) they knew that the brunt of the injury would be felt by the plaintiff in the forum State where she lived, worked and the article would have the largest circulation.  The knowledge that the major impact would be felt in the forum State constitutes a purposeful contact or substantial connection whereby the intentional tortfeasor could reasonably expect to be haled into the forum State's courts to defend his actions.

Hugel v. McNell, 886 F.2d 1, 4 (1st Cir. 1989) (citing Calder, 465 U.S. at 789-90).  In Hugel, the First Circuit applied the Calder "effects" test to determine if nonresident defendants could be haled into a New Hampshire court for their part in the nationwide publication of a libelous story in the Washington Post.  The plaintiff, a New Hampshire resident, claimed that his New Hampshire personal and business reputations were harmed by the defendants who released false and defamatory information to the Washington Post who in turn published an article containing that information.

In assessing the plaintiff's complaint to determine whether the "effects" test was satisfied, i.e., whether the defendants had made a purposeful contact or a had a substantial connection

17

to New Hampshire such that their being haled into a New Hampshire forum to defend their actions was foreseeable, the <u>Hugel</u> Court, reasoned as follows:

> The complaint sufficiently alleges that the McNells actually directed their actions at a New Hampshire resident.  The McNells knew that release of the allegedly false information would have a devastating impact on Hugel, and it can be fairly inferred that they intended the brunt of the injury to be felt in New Hampshire where Hugel had an established reputation as a businessman and public servant.  Specifically the allegations in Hugel's complaint assert that the McNells gave the information to the Washington Post reporters with the intent that it be published and thus disseminated nationwide and cause damage to Hugel's reputation in New Hampshire.  The intended result of the McNell's contact with the reporters and release of information to them, according to the complaint, was to impugn Hugel's honesty, integrity, and his ability to perform duties as either a public official or businessman . . . .  The complaint alleges that the McNells committed an intentional tort, directed their actions toward the forum state, and knew that the brunt of the devastating blow caused by release of the allegedly libelous material would be felt in the State where Hugel resides and has an established reputation as a businessman and public servant.  The district court correctly read the complaint as establishing that the McNells could reasonably expect to be haled into a New Hampshire court to answer for their conduct, and thus the assertion of in personam jurisdiction over the McNells satisfies the dictates of Due Process.

<u>Hugel</u>, 886 F.2d at 5.

18

Kennett alleged that defendants committed intentional torts which caused "substantial injury in his home state of New Hampshire, (complaint ¶¶ 1, 26, 34, 41, 48, 53), in that American Housing Funds' clients and partners were expected to be included in Kennett's future real estate, movie and video ventures, but now "are not prepared to assist Mr. Kennett" after reading defamatory letters sent to them by defendants. (complaint ¶¶ 20, 27). Kennett also alleges that the defendants knew the letters were directed at a New Hampshire resident and would harm him there. (See complaint ¶¶ 31, 34, 38, 41, 45, 48, 52). It can be reasonably inferred from these allegations that the defendants knew that the brunt of the harm would be felt by Kennett in New Hampshire. In fact, as discussed above, evidence in the record indicates that at the time the letters were distributed, Nagler and Hardin both knew that plaintiff lived and worked in New Hampshire. Thus, as in Calder, the plaintiff alleges that the defendants: (1) aimed their actions at the forum state; (2) knew that their actions would have a devastating impact on the plaintiff; and (3) knew the brunt of the injury would be felt in the forum state where plaintiff lived and worked.

Defendants cite to two Ninth Circuit decisions in support of their contention that the dissemination of defamatory material in the forum state is an essential element of the Calder "effects" test. See generally Casualty Risk Insurance Co. v. Dillon, 976

19

F.2d 596 (9th Cir. 1992); Core-vent Corp. v. Nobel Industries AB, 11 F.3d 1482 (9th Cir. 1993). To the extent those cases stand for that proposition, the court declines to follow them. Rather, the court agrees with the Ninth Circuit's reasoning in Haisten v. Grass Valley Medical Reimbursement, 784 F.2d 1392, 1396-1396 (9th Cir. 1986) ("activity by the defendant need not physically take place in the forum state so as to constitute sufficient contact under the due process test. . . . [T]he Supreme Court has consistently rejected the notion that absence of physical contacts with a forum state can defeat personal jurisdiction, '[s]o long as a commercial actor's efforts are 'purposefully directed' toward residents of another state.'") (citations omitted).

Additionally, defendants cite to McNell v. Hugel, No. 93-462-JD (D.N.H. May 16, 1994), affirmed, No. 95-1470, 1996 WL 75320 (1st Cir. Feb. 26, 1996), as supportive of the necessity of dissemination in the forum state. In McNell, however, the lack of distribution of the libelous newspaper article in New Hampshire was but one of several factors weighing against assertion of jurisdiction under the facts of that case. Notably, the district court determined that the effects of the article were not aimed at New Hampshire, but were directed at New York and New Jersey. The plaintiff was not a resident of New Hampshire and did not claim to have a business reputation injured

20

in the forum state.  <u>McNell</u>, therefore, is distinguishable from the present case.

In <u>Calder</u> also, the widespread distribution of the defamatory article in California was but one of several factors which established that the defendants could foresee that the brunt of the harm would be felt in the forum state.  <u>See</u> <u>Calder</u>, 465 U.S. at 789-790.  <u>Calder</u> does not require actual publication in the forum state to be present in order to satisfy the "effects" test.  In fact, in <u>Hugel</u>, where there was some dissemination in New Hampshire, the First Circuit did not focus on or recognize that factor in applying the "effects" test.  <u>See</u> <u>Hugel</u>, 886 F.2d at 4-5; <u>see</u> <u>also</u> <u>First American First v. National Association of Bank Women</u>, 802 F.2d 1511, 1516-1517 (4th Cir. 1986); <u>Burt v. Board of Regents of University of Nebraska</u>, 757 F.2d 242, 244-245 (10th Cir. 1985).  As the Seventh Circuit stated in its interpretation of the "effects" test, "the key to <u>Calder</u> is that the effects of an alleged tort are to be assessed as part of the analysis of the defendant's relevant contacts with the forum.  Whether these effects, either alone or in combination with other contacts, are sufficient to support <u>in personam</u> jurisdiction will turn upon the particular facts of each case." <u>Wallace v. Herron</u>, 778 F.2d 391, 395 (7th Cir. 1985), <u>cert. denied</u>, 475 U.S. 1122 (1986).  As discussed above, the facts of this case demonstrate that the defendants could reasonably

21

foresee that the brunt of the harm caused by their actions, aimed at a New Hampshire resident, would be felt by the plaintiff in New Hampshire where he lived and worked.

In light of the foregoing, the court finds that plaintiff's complaint sufficiently alleges that the defendants' out-of-state letters constitute purposeful contacts with New Hampshire. The defendants could reasonably expect to be haled into this forum to answer for the out-of-state letters directed at a resident of New Hampshire.

### C. The Gestalt Factors as to All Defendants and All Letters

After finding the relatedness and purposeful availment prongs satisfied, the court must determine whether exercise of jurisdiction comports with fundamental fairness. Ticketmaster, 26 F.3d at 209. In gauging fairness, courts consider the following factors: (1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interest of all sovereigns in promoting substantive social policies. Sawtelle, 70 F.3d at 1394.

22

## 1.    Defendants' Burden of Appearing

Litigating in a foreign forum is almost always inconvenient to out-of-state defendants.  Thus, this factor is only meaningful when some special, onerous, or unique burden is demonstrated.  Pritzger v. Yari, 42 F.3d 53, 64 (1st Cir. 1994), cert. denied, 115 S.Ct. 1959 (1995).  In Ticketmaster, 26 F.3d at 201, the Court of Appeals for the First Circuit held that "the burden associated with forcing a California resident to appear in a Massachusetts court is onerous in terms of distance."  But, in Sawtelle, 70 F.3d at 1381, the same court held that forcing Florida attorneys to litigate in New Hampshire was not an unusual burden.  That finding was based on the fact that the law firm regularly litigated outside Florida.  The rationale of Ticketmaster is more applicable here because the record does not indicate that Nagler, Hardin, or BTCAH are regularly involved in out-of-state litigation, and certainly not to the extent the defendants in Sawtelle were.

Additionally, Nagler claims that because he is 72 years old and recovering from quintuple bypass heart surgery, it would be unfair to force him to defend himself in New Hampshire.  The distance from Texas to New Hampshire for Nagler and Hardin, and from California or Texas for BTCAH, presents a burden similar to that identified in Ticketmaster.  Moreover, as to Nagler, his age

and stamina following heart surgery add to his inconvenience. Accordingly, this factor weighs in favor of the defendants.

### 2.  New Hampshire's Interest

New Hampshire has a significant interest in redressing injuries to its residents that actually occur within the state. See Keeton v. Hustler, 465 U.S. 770, 776-777 (1983) (citing Leeper v. Leeper, 114 N.H. 294, 298 (1974)). This interest is implicated in cases where defamatory letters are sent to out-of-state customers of a New Hampshire business, interfering with future New Hampshire-related business. Buckley v. McGraw Hill, 701 F. Supp. 272, 276 (D.N.H. 1988) (citations omitted). Thus, this factor cuts in favor of the plaintiff.

### 3.  Plaintiff's Interest

The plaintiff's interest in obtaining convenient and effective relief is the next consideration. This circuit has repeatedly held that a plaintiff's choice of forum must be given some degree of deference. See, e.g., Sawtelle, 70 F.3d at 1395; Pritzker, 42 F.3d at 64. "Here, unquestionably, it would be more convenient for the [plaintiff] to litigate [his libel and contractual interference] claim in [his] home state rather than elsewhere." Sawtelle, 70 F.3d at 1395. Thus, this factor weighs in favor of the plaintiff as well.

### 4. Administration of Justice

The judicial system's interest in obtaining the most effective resolution of the controversy "does not appear to cut in either direction" in this case. Sawtelle, 70 F.3d at 1395 (citing Ticketmaster, 26 F.3d at 211). Since witnesses and evidence will likely come from New Hampshire, Texas and other states, it is not clear that the judicial system's concern for efficiency would be better served in another forum. As a result, this factor is neutral.

### 5. Common Interest of All Sovereigns in Promoting Social Policies

Here, as in Sawtelle, "the most prominent policy implicated is the ability of a state to provide a convenient forum for its residents to redress injuries inflicted by out-of-forum actors." 70 F.3d at 1395 (citing Burger King, 471 U.S. at 473). This policy is important in a case such as this where an entrepreneur's business reputation and ability to raise revenue from investors are harmed by the dissemination of libelous letters from tortfeasors in another state, the effects of which are primarily felt here. State residents would face substantial burdens in this type of case if forced to pursue relief in foreign jurisdictions. Additionally, public policy discourages

25

libel and contractual interference by extra-territorial tortfeasors. To deny jurisdiction in this case would encourage libel aimed at state residents so long as it was disseminated in other states. This factor, therefore, weighs in favor of the plaintiff.

### D. Tallying the Results

Plaintiff succeeded in demonstrating that his causes of action related to and arose out of the defendants' contacts with New Hampshire. Plaintiff also has shown that the defendants' voluntary contacts were purposefully directed at New Hampshire, such that being haled into a New Hampshire forum was reasonably foreseeable. The court now proceeds to add its findings on the Gestalt factors.

A finding of unreasonableness can trump a minimally sufficient showing of relatedness or purposefulness. However, the "Gestalt" factors evoke a sliding scale: the weaker the showing on relatedness and purposefulness, the less unreasonableness the defendant need show; likewise, a strong showing of reasonableness may fortify a borderline showing of relatedness and purposefulness. Ticketmaster, 26 F.3d at 210. Here, the plaintiff's showing of relatedness and purposefulness is fairly solid as to both in-state and out-of-state letters. In these circumstances, a strong showing of reasonableness is not

26

required under the sliding-scale balancing test.  <u>See</u>
<u>Ticketmaster</u>, 26 F.3d at 210.

That said, the court finds that the interest of the forum, plaintiff's convenience, and pertinent policy concerns combine to tip the scales in favor of finding that the assertion of jurisdiction over Hardin, Nagler and BTCAH is reasonable. Although accepting Nagler's advanced age and diminished health as additional burdens to him, requiring his appearance here is not fundamentally unfair.  It does not give rise to a level of unreasonableness sufficient to overcome the plaintiff's showing on the other elements and factors pertinent to the jurisdictional analysis.  Therefore, exercise of personal jurisdiction over all defendants on all causes of action comports with due process, and defendants' motions to dismiss for lack of personal jurisdiction are denied.

## III.  Venue

Since this is a "civil action wherein jurisdiction is founded only on diversity of citizenship," 28 U.S.C. § 1391(a) applies and provides Kennett with three venue options.  Kennett has chosen to lay venue under § 1391(a)(2), "in a judicial district in which a substantial part of the events or omissions

27

giving rise to the claim occurred . . . ."  28 U.S.C.A.
§ 1391(a)(2) (West 1993).

Both the in-state and out-of-state letters are alleged to have caused substantial injury in New Hampshire.  In _Price_, 781 F. Supp. at 94-95, this court analyzed language under § 1391(b)(2) that is identical to that quoted above.  To aid in interpretation, the court examined the official commentary to 1391(a)(2), as well as the enactment's legislative history, and found that the language was designed to permit venue in any of numerous potential locations that qualify as a district in which "a substantial part" of the activities giving rise to the claim occurred.  _Id_. at 94.  The court held as follows:

> Plaintiff VDI has satisfied this court that New Hampshire is the place where at least some things happened, i.e., the alleged tortious injuries to a New Hampshire corporation.  While there may be another situs of substantial activity in this case, the court finds that plaintiff has met its burden that venue is proper in this district.

_Id_. at 94-95.  Likewise, plaintiff in this case has specifically alleged tortious injuries to his ability to function as an entrepreneur in New Hampshire.  That alleged injury in New Hampshire constitutes a substantial event giving rise to the plaintiff's claims.  Considering the letters disseminated in states other than New Hampshire, it could be argued that the most substantial events occurred outside this state.  However, this

28

argument fails because "[i]f the selected district's contacts are 'substantial,' it should make no difference that another's are more so, or the most so." Id. at 94 (citations omitted). Accordingly, venue is proper in this district. Defendants' motions to dismiss for improper venue are, therefore, denied.

## IV. Conclusion

The defendants' motions to dismiss (documents no. 22 & 23) for lack of personal jurisdiction and improper venue are denied. The plaintiff has made a prima facie showing that assertion of jurisdiction comports with the New Hampshire Long-Arm Statute and constitutional due process requirements. Additionally, plaintiff has demonstrated that venue in this district is proper.


        SO ORDERED.


                                        _____
                                        Steven J. McAuliffe
                                        United States District Judge

March 26, 1996

cc:  Douglas Kennett
     G. Martin Jacobs, Esq.
     R. Stevenson Upton, Esq.